# Richmond.

## FALLSBURG, &c. Co. v. ALEXANDER.

### January 15, 1903.

1. EMINENT DOMAIN—*Private Property for Private · Use—Constitutional Law.*—Although not forbidden by the Constitution of this State the Legislature cannot authorize the taking of private property for private use, as it is contrary to the fundamental principles of a republican government.

2. EMINENT DOMAIN—*Public Use.*—A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain.

3. EMINENT DOMAIN—*Case in Judgment—Private Use—Internal Improvement Companies.*—The Legislature cannot authorize a corporation to condemn private property in order to locate a plant for the "manufacture and generation of water power, light or heat, to be utilized, transmitted and distributed to any place or places for the company's use, or for the use of other individuals or corporations." The interest of the public, if any, is vague, indefinite and uncertain, and may at any time be denied or withdrawn by the company. The mere recognition of the corporation in its charter as an "Internal Improvement Company," does not make it so, nor bring it within the general laws governing and controlling the operations of such companies.

Error to a judgment of the Circuit Court of Albemarle county, rendered February 7, 1901, affirming the judgment of the County Court of said county in a condemnation proceeding,

wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Affirmed.*

The opinion states the case.

*C. W. Allen* and *Daniel Harmon*, for the plaintiff in error.

*John B. Moon*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Albemarle county affirming a judgment of the County Court of that county dismissing a proceeding instituted by plaintiff in error to condemn certain lands of the defendants in error, alleged to be needed for the purposes of the corporation as an internal improvement company.

Among the many and comprehensive powers and privileges intended to be conferred by the act of the General Assembly, entitled, "An act to incorporate the Fallsburg Power and Manufacturing Company" (Acts of 1899-1900, p. 418), are the following:

"To erect, maintain, and operate its plant or plants, acquire, own, develop, maintain, operate and use water power on the James River, and for this purpose it may erect and maintain a dam across said river from a point in Albemarle county to the Buckingham side; and to construct canals and other hydraulic and auxiliary steam works and manufacture and generate water power, electrical or other power, light or heat, and utilize and transmit and distribute such power, light or heat to any place or places for its own use or for the use of other individuals or corporations; and may construct, own, maintain and operate telephone lines between any or all of its works or plants. And for the purpose of constructing its dam, canals and plants, and machinery necessary to develop and generate power, light or

heat, and such pipe or wire lines as may be necessary to utilize or deliver the same and for the construction of a railroad or railroads and telephone lines, said company is given the power of eminent domain, with all the rights, powers, and privileges given to internal improvement companies by the laws of this State, except in so far as such laws might be modified," etc.

Being unable to "agree on the terms of purchase with those entitled to lands wanted for the purposes of such company" (Code, sec. 1074), plaintiff in error, under its supposed powers as an internal improvement company, gave to defendants in error notice that it would proceed in the County Court of Albemarle for the condemnation of their lands and water rights in the James river, or such of them as were needed for the company, under sections 1075, 1076, 1077, 1078 and 1079 of the Code. The notice sets forth that the appointment of commissioners will be asked "who shall ascertain and report what will be a just compensation for so much of your land, and so much of water right in the James river, situated in the said county of Albemarle, Va., and described as follows: 'That tract of land conveyed to you by Mrs. Eliz. Rives, lying on the south side of Ballinger's creek, near Warren, and having a front on James river,' being the same tract of land upon which you now reside, as well as for damages to the residue of your said tract beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed."

Upon the return of this notice, the defendants in error moved to quash it, on three grounds, two of which were sustained, one of them being that the proceeding is an attempt to take private property for private use. While, as we have stated, the charter of plaintiff in error confers upon it very extensive powers and privileges, this proceeding is under that portion of the charter quoted which authorizes it to acquire by condemnation the lands of defendants in error and so much of their water rights in the James river as may be needed for the

purposes of the company. In other words, the purpose is to acquire by condemnation so much of the lands and water rights of defendants in error as may be needed by the company to enable it to locate and establish its plant or plants for the "manufacture and generation of water power, electrical power, or other power, light or heat, to be utilized, transmitted and distributed to any place or places for the company's use, or for the use of other individuals or corporations."

The case has been ably argued for both plaintiff in error and defendants in error, though the discussion has taken a very much wider range than is necessary to a decision of the case, and it is conceded by counsel for the former that the sole question at issue is whether the power granted to plaintiff in error by the Legislature is forbidden by the limitations of the Constitution; that if the Legislature has transcended its powers it cannot matter whether it has done so in violation of the Federal or State Constitution. Its act in either case is void, the prohibition in either case being based upon the assumption that the charter authorizes the taking of private property for private, and not public, purposes.

Neither in our Constitution, nor in the constitutions of other States of the Union, is there any express provision forbidding the Legislature to pass laws whereby the private property of one citizen may be taken and transferred to another for his private use. As has been well said by Green, J., in *Varner* v. *Martin*, 21 West. Va. 548: "It was doubtless regarded as unnecessary to insert such a provision in the Constitution or bill of rights, as the exercise of such an arbitrary power of transferring by legislation the property of one person to another, without his consent, was contrary to the fundamental principles of every republican government; and in a republican government neither the legislative, executive, nor judicial department can possess unlimited power." In that case it is further said that there is an entire concurrence of all the

authorities in the proposition, that private property cannot be taken for private use, either with or without compensation.

In approaching the question presented, we recognize the well established rule that every presumption is in favor of the right of plaintiff in error to exercise the powers distinctly granted in its charter, and that the right will not be abridged unless the Legislature has clearly transcended its constitutional authority. In other words, unless the grant of the right of eminent domain is clearly in violation of the constitutional inhibition, the act will be upheld; and it is also true courts go no further in determining the constitutionality of an act of the Legislature than is necessary to a decision of the particular question at issue. Therefore, the only question to be considered here is, whether it is within the constitutional authority of the Legislature to confer upon an individual or corporation the right of eminent domain to acquire a site or location for a plant to manufacture or generate water power, electrical power, or other power, light or heat, and utilize, transmit and distribute such power, light or heat, to any place or places for the individual's or corporation's "own use or for the use of other individuals or corporations."

Section 14, Article V., of our State Constitution, in force when this proceeding was begun, provides that no law shall be passed by the Legislature "whereby private property shall be taken for public uses without just compensation."

Whenever the public use of property requires it, the private rights of property must yield to this paramount right of sovereign power to take it for the public use. When so taken, it is the character of the use for which the property is taken, and not the means or agencies by which it is taken, which determines the question whether it is legally taken under the legitimate exercise of the right of eminent domain, but in all cases the use for which it is proposed to take private property in the exercise of this right must be a public use, or for a public pur-

pose, and this, as is conceded, is a question for judicial deter-mination.

No attempt has been made by the courts or law-writers to lay down a general rule for determining this question, and it would be impossible in an opinion of reasonable length to re-view all the cases in which courts have had occasion to decide what is and what is not a *public use* of property.

It is said in *Scudder* v. *Trenton Del. Falls Co.,* 1 N. J. Eq. 674, 23 Amer. Dec. 756: "The great principle remains that there must be a public use or benefit. That is indispensable. But what that shall consist of, or how extensive it shall be to authorize an appropriation of private property, is not easily re-ducible to a general rule. What may be considered a public use may depend somewhat on the situation and wants of the community for the time being."

The cases decided by this court having any bearing upon the question are collated in the opinion in *Varner* v. *Martin, supra,* but they arose out of acts authorizing owners of mill-sites to condemn lands for the erection of dams to supply water power for grist-mills, and also to condemn lands to be overflowed for the erection of such mill-dams. The right to condemn lands for such purposes was clearly recognized in those cases, and al-though the statute laws of Virginia have gone beyond authoriz-ing the condemnation of lands for water grist-mills alone, and have been extended so as to include not only water grist-mills, but other purposes, useful to the public, there has been no con-demnation of lands for mills or manufactories of any sort other than water grist-mills, so far as the Virginia Reports show.

In *Varner* v. *Martin, supra,* referring to that class of cases, other than those in which the general public have the imme-diate use of the property condemned without charge, as in cases of public highways, where the property condemned is under the control of public officers, though the gratuitous use of it is enjoyed by the public at large, etc., the opinion demon-

strates that where the property condemned is in the direct use and occupation of a private person, or of a private corporation, and the general public have only an indirect and qualified use of it, or perhaps no use of it of any kind, but simply derives from its use some indirect advantage, as by the promotion of the general prosperity of the community, to which belong railroads, ferries, grist-mills, etc., in order that a person or corporation may be included in this class and have legislative authority to condemn lands, it must be shown that he or they are possessed of each and all of three qualifications: First, the general public must have a definite and fixed use of the property to be condemned, a use independent of the will of the private person or private corporation in whom the title of property when condemned will be vested; a public use which cannot be defeated by such private owner, but which public use continues to be guarded and controlled by the general public through laws passed by the Legislature; second, this *public use* must be clearly a needful one for the public, one which cannot be given up without obvious general loss and inconvenience; third, it must be impossible, or very difficult at least, to secure the same public uses and purposes otherwise than by authorizing the condemnation of private property.

The opinion further says: "Upon the principles we have laid down it would follow that the Legislature could not authorize lands to be condemned for the erection of dams, or for the overflowing of lands by dams erected for saw-mills or manufactories generally, because they obviously want the first qualification we have laid down as necessary to confer this power on the Legislature. The general public have no general and fixed use of any such mills and manufactories. They have no use of them which is independent of the owners of such mills and manufactories, and they can be defeated in any sort of use of such mills and manufactories at the pleasure of the owners of them."

In *Plecker* v. *Rhodes,* 30 Gratt. 798, it is said: "Authority

given to an individual for the construction of a toll-bridge across a river is a franchise which is to benefit the individual to whom it is granted, else he would not undertake it; but it is granted to the individual in consideration of the convenience and benefit it will be to the public. All these exercises of the functions of sovereignty by the Legislature and the bestowment of franchises upon individuals are designed to be for the public benefit.

"Undertakings which are sought to be promoted by the right of eminent domain are often of private benefit. The judicial practice in such cases is to approve the undertaking if it is capable of furthering a public use, and disregard the private benefit as a mere incident. This practice is correct where the public interest clearly dominates the private benefit, as, for example, the public interest in railroad transportation dominates the private benefit from tolls. Even where the disproportion between public and private benefit is much less marked, the courts are justified in sustaining a legislative act by singling out the public use." Randolph on Em. Domain, sec. 54. But this learned author says in sec. 55: "In placing works of partly private use, it is essential that the private use will be incidental and not exclusive. Thus where a company was authorized to build a basin and reserve a part for its use, the act was declared unconstitutional. Citing *Eureka Basin*, 96 N. Y. 42. The opinion in the case cited says: "The taking of private property for private purposes cannot be authorized even by legislative acts, and the fact that the use to which the property is intended to be put, or the structure intended to be built thereon, will tend incidentally to benefit the public . . . is not sufficient to bring the case within the operation of the right of eminent domain, so long as the structures are to remain under private ownership and control, and no right to their use or to direct their management is conferred upon the public."

In *Ryerson* v. *Brown*, 35 Mich. 333, 24 Amer. Rep. 564, it

was held under the laws of Michigan, which imposed no public duties and responsibilities upon mills and their owners, but which authorized the condemnation of lands for the purpose of the establishment of mills, that the act authorizing the condemnation of lands for that purpose was void. The opinion by Cooley, J., says: "It is manifest that in such a case the proprietor (of a mill) can have no valid claim to the interposition of the law to compel his neighbor to sell a business site to him any more than could the manufacturer of shoes or the retailer of groceries.

"Indeed, the last two named would have far higher claims, for they would subserve actual needs, while the former would at most only incidentally benefit the locality by furnishing employment and adding to local trade.

"There is nothing in the present legislation to indicate that the power obtained under it is to be employed directly for the public use. Any sort of manufacture may be set up under it, and the proprietor is not obliged in any manner to carry it on for the benefit of the locality, or of the state at large."

In a more recent case decided by the same court in 1891, *Board* v. *Hoesen*, 49 N. W. 894, 14 L. R. A. 114, it was said: "To justify the condemnation of lands for a private corporation, not only must the purpose be one in which the public has an interest, but the state must have a voice in the manner in which the public may avail itself of that use. In *Gilmore* v. *Lime Point*, 18 Cal. 229, a public use is defined to be a use which concerns the whole community as distinguished from a particular individual. The use which the public is to have in such property must be fixed and definite. The general public must have a right to a certain definite use of the private property on terms and for charges fixed by law, and the owner of the property must be compelled by law to permit the general public to enjoy it. It will not suffice if the general prosperity of the community is promoted by the taking of private property

from the owner and transferring its title and control to a corporation, to be used by such corporation as its private property uncontrolled by law, as to its use; in other words, the use is private so long as the land is to remain under private ownership and control, and no right to its use, or to direct its management, is conferred upon the public."

Randolph on Eminent Domain, sec. 55, lays down the broad doctrine that manufacturing companies cannot condemn land for their purposes.

In Lewis on Eminent Domain, sec. 165, in discussing the meaning of the term "public use," and referring to the provision usually inserted in state constitutions on the subject, it is said: " 'Public use' means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are: First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use when the phrase was first brought into use in the earlier constitutions; third, it is the only view which gives the words any force as a limitation or renders them capable of any definite and practical application." In a note to this text it is said: "The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use, which cannot be gainsaid or denied or withdrawn by the owner" citing *Farmers' Market Co.* v. *Philadelphia R. R. Co.,* 10 Pa. Co. Ct. 25 and a number of other authorities.

"Strictly speaking, private property can only be said to have been taken for public uses when it has been so appropriated that the public have certain well-defined rights to that use secured, as the right to use the public highway, the public ferry, the railroad, and the like. But when it is so appropriated that the public have no right to its use secured, it is difficult to per-

ceive how such an appropriation can be denominated a public use." *Jordan* v. *Woodward,* 40 Me. 317.

To the effect that the power of eminent domain to condemn a site for · a manufacturing plant or for a railroad track to facilitate such a business undertaking, or for a plant some distance from its line to generate electricity to operate an electrical railway, or for an elevator to be used in buying, selling or storing grain, cannot be conferred upon individuals or a corporation incorporated for .no public purpose and charged with no public duties, are the cases of *Garbutt Term. Co.* v. *Ga. & A. Ry.* (Ga. 1900), 36 S. E. 942; *In re Rhode Island Sub. Ry. Co.* (R. I.), 48 Atl. 590, 52 L. R. A. 879; *Chicago, &c. R. Co.* v. *State Bd. of Transp.,* 50 Neb. 399, 69 N. W. 955; *Mo. Pac. Ry. Co.* v. *Nebraska,* 164 U. S. 403, 41 L. Ed. 489. In those cases it was held that such a taking of private property would be for a purely private purpose.

In his work on Constitutional Limitations, 654, Judge Cooley says: "The public use implies a possession, occupation and enjoyment of the land by the public at large, or by public agencies; and the due protection to the rights of private property will preclude the government from seizing it in the hands of the owner and turning it over to another on vague grounds of public benefit to spring from a more profitable use to which the latter may devote it."

In the view that we take of the case at bar, it is wholly unnecessary to consider the question whether or not the proposed taking of the property of defendants in error is in violation of the fourteenth amendment of the Constitution of the United States, providing that private property cannot be taken for any purpose without due process of law, since, if the proposed taking is for a private and not a public use, it is clearly in violation of our State Constitution.

It is urged upon us that although the charter in question does not command the performance of the company's public

duties, since it is "a public service corporation," the right of public control arises from the grant of the franchise of eminent domain, and when the company undertakes to devote its property and its products to the public use, it becomes subject to public regulations. This proposition is unquestionably sound and sustained by the authorities cited—*Munn* v. *The People of Ill.*, 98 U. S. 113, 24 L. Ed. 77; *Budd* v. *N. Y.*, 143 U. S. 538, 36 L. Ed. 247; *Brass* v. *N. Dakota*, 153 U. S. 391, 38 L. Ed. 757, to which many others may be added; but this does not meet the difficulty in this case. The mere recognition of the corporation in its charter as an "Internal Improvement Company" does not make it so, and bring it within the operation of the general laws of the State governing such companies and controlling their operations. The difficulty with the charter is that the purpose for which the property is authorized to be taken by the right of eminent domain in this instance does not clearly appear to be for a public use or a public purpose. On the contrary, the grounds of public benefit upon which the taking is proposed are vague, and the use which the public is to have of the property, or the manner in which the public is to be benefited by the use of it by the company, is by no means fixed and definite. Not only is the public benefit to spring from the use to which the company proposes to devote the property vague, indefinite, and uncertain, but, under the plain language of the charter, the public use of the property or any use of it by the public may be gainsaid or denied or withdrawn by the company at its will, since it is authorized to use, not only a part, but the entire product of the work or works it proposes to establish, for its own use or benefit. In such a case the private benefit too clearly dominates the public interest to find constitutional authority for the exercise of the power of eminent domain, and is the equivalent of taking of private property for a private use, against the will of the owner, which cannot be done in any case.

The difficulties confronting plaintiff in error in this particu-

Opinion.

lar cannot be obviated by invoking the general laws of the State specifying and regulating the public duties and obligations of Internal Improvement Companies. These statutes, contained in chapter 51 of the Code, impose no duty upon such a company that can be made to apply to this corporation in its manufacturing operations, to say nothing of the other uses to which it may, under its charter, put the land and water rights sought to be acquired by condemnation. We do not mean to say, however, that under no conditions can the right of eminent domain be conferred by the Legislature in furtherance of the establishment of plants for the generation of electric power or other power, light or heat, where public necessity requires it, and the public use or benefit is apparent and safely guarded. To meet industrial progress, new conditions, and the ever increasing necessities of society, the courts have gone very far in sustaining legislation conferring the franchise of eminent domain, and it is not necessary for us, in this case, if we were so inclined, to question the soundness of the policy sustained in those decisions.

We are of opinion that the judgment complained of here is right, and it is, therefore, affirmed.

*Affirmed.*