WISCONSIN RIVER IMPROVEMENT COMPANY, Respondent, vs. PIER and another, imp., Appellants.

*December 1—December 15, 1908.*

*Eminent domain: Jurisdiction of superior court of Lincoln county: "Actions and proceedings:" "At law and in equity:" Public and private laws: Subjects and titles: Constitutional provisions: Corporations: Corporate existence: Presumptions: Public utilities: "Public use:" "Private use:" "Public:" Delegation of power of eminent domain: Dams in aid of navigation: Surplus power created: Public-service corporations: Navigable waters.*

1. Ch. 295, Laws of 1905, relating to the superior court of Lincoln county, invests that court with jurisdiction equal to and concurrent with the circuit court for Lincoln county "in all civil actions and proceedings at law and in equity," and also provides that, whenever any statute mentions the circuit judge or judge of the circuit court, these words shall be deemed to apply to the judge of such superior court. *Held:*

    (1) The words "actions and proceedings" together cover all remedies to be obtained in courts.

    (2) The words "at law or in equity" embrace all exercise of judicial or *quasi*-judicial power on the part of courts, whether

the power be conferred upon courts by statute, common law, or equitable rules.

(3) The power conferred upon the circuit court or the judge thereof by ch. 292, Laws of 1880 (authorizing the Wisconsin River Improvement Company to exercise the power of eminent domain), is under ch. 295, Laws of 1905, conferred upon the superior court of Lincoln county and upon its judge.

2. Ch. 292, Laws of 1880, is entitled "An act to amend ch. 171, P. & L. Laws of 1868, entitled 'An act to incorporate the Wisconsin River Improvement Company, and to amend ch. 298, Laws of 1876, amendatory thereof.'" In this title there is, first, a false description wherein the amended act is designated as ch. 171, P. & L. Laws of 1868, when it should be described as ch. 171, P. & L. Laws of 1866; second, a correct description of ch. 298, Laws of 1876, which latter contains the same false description in its title, but also purports to amend ch. 171, P. & L. Laws of 1866; and third, a correct description of the subject of the law sought to be amended, as "An act to incorporate the Wisconsin River Improvement Company." Held, assuming that ch. 292, Laws of 1880, is private or local, that it is not invalid because the subject of the act is not expressed in its title (sec. 18, art. IV, Const.), since neither the casual hearer nor the investigator would be misled and the constitutional requirements are satisfied.

3. Where the charter of a corporation is not in evidence and no special charter is shown, it will be presumed that it was organized under the general incorporation statutes.

4. The Wisconsin River Improvement Company, incorporated under a special charter, was authorized to improve the Wisconsin river in such manner as it should deem expedient or advisable, from Stevens Point to the headwaters of that river, and was given authority to erect and maintain dams and to acquire by condemnation proceedings land along the river for the purpose of facilitating and cheapening the driving and floating of logs, timber, and lumber in the river. At a time when the driving and floating of logs in the Wisconsin river was very much diminished from its former proportions, the Improvement Company entered into a contract with the Tomahawk Power Company, a corporation formed for the purpose of heating, lighting, or furnishing power or signals by electricity, whereby the latter corporation was to construct dams and river improvements in the territory within which the Improvement Company was authorized to act, at its own expense, and in consideration thereof the Power Company was to reimburse and profit itself by the sale of power. Held:

(1) In so far as the Tomahawk Power Company is a corpo-

ration organized to furnish power, that authority and duty is distinct from any other corporate authority it may have assumed by any additional provisions in its articles.

(2) Under ch. 499, Laws of 1907 (sec. 1797*m*—1, Stats.), the public are entitled to use and enjoy the power created by dams and improvements upon its navigable rivers, not as a mere favor or by mere permission of the owner, but by right.

5. In such case by "the public" is meant, not the whole population of the state, but all persons who require power and are willing to pay reasonable rates therefor.

6. "Public use" is not synonymous with "public benefit."

7. A corporation possessing the power of eminent domain, to be exercised in aid of navigation by the construction of a dam, after entering into a contract for the construction of a dam with a public-service corporation, whereby the latter was to construct the dam solely at its own expense and to have all the profits arising from the sale of power generated at the dam and the former to retain its right to collect the tolls arising from navigation and retain control and management of the improvement for all purposes of navigation, may exercise such right of eminent domain, although the rates for power will probably exceed the tolls for navigation, and the corporation possessing the power of eminent domain would probably not have voluntarily exercised that right had it not made such a contract.

8. In such case the value of the improvement to navigation is not to be measured alone by the probable amount of tolls to be received; nor does the fact that the revenues to be derived from the sale of power may largely exceed the tolls to be derived from navigation furnish the test of which is the incidental and which is the primary purpose of the improvement so far as public interests are concerned.

9. A dam may be as effectual in aid of navigation in a case where the owner can get it built by foregoing or assigning his right to some collateral use of the dam as in a case where he is obliged to put his own money into the construction.

10. The extent to which a dam will benefit navigation is not to be measured by its cost nor the motives which impel its construction.

11. Where the public use justifies the erection of a dam, and the dam, in addition to subserving its public purpose, incidentally causes a surplus of water available for power and for private use, the public use is not thereby impaired or destroyed.

12. Public-service corporations are at all times answerable to the state for nonfeasance or misfeasance in their obligations to the public.

Wisconsin River Imp. Co. v. Pier, 137 Wis. 325.

13. A corporation, authorized as an incident to improving a navigable river to construct a dam, cannot maintain such dam as an impediment to navigation or as only useful for generating power.

14. In proceedings to condemn lands for flowage to be created by a dam to be erected in aid of navigation, the evidence failed to show that the dam was to be constructed or the land to be taken for any private use. *Held*, that the creation of an additional public use of generating and distributing power did not make unlawful the condemnation proceedings.

APPEAL from an order of the superior court of Lincoln county: ALMON A. HELMS, Judge. *Affirmed*.

The appeal is from an order refusing to vacate an order made by the judge of said court appointing commissioners in a condemnation proceeding.

For the appellants there was a brief by *Caroline H. Roemer*, attorney, and *Quarles, Spence & Quarles* and *George Lines*, of counsel, and oral argument by *T. W. Spence*.

Among other references upon the part of the appellants were the following: *Powers v. Bears,* 12 Wis. 213; *State v. Hogue,* 71 Wis. 384, 36 N. W. 860; *Western Union R. Co. v. Dickson,* 30 Wis. 389; *Eaton v. Williams,* 51 Wis. 99, 7 N. W. 838; *Baker v. State,* 56 Wis. 568, 14 N. W. 718; *Yellow River Imp. Co. v. Arnold,* 46 Wis. 214, 49 N. W. 971; *Verges v. Milwaukee Co.* 116 Wis. 191, 93 N. W. 44; *State ex rel. Vandenhouten v. Vanhuse,* 120 Wis. 15, 97 N. W. 503; *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 67 N. W. 918, 33 L. R. A. 645; *In re Theresa D. Dist.* 90 Wis. 301, 63 N. W. 288; *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *Maginnis v. Knickerbocker I. Co.* 112 Wis. 385, 88 N. W. 300; sec. 1777a, Stats. (1898); *Wis. W. Co. v. Winans,* 85 Wis. 26, 54 N. W. 1003.

For the respondent there was a brief by *Smart & Curtis,* and oral argument by *E. M. Smart.*

Among other references upon the part of the respondent were the following: *Wis. Cent. R. Co. v. Cornell Univ.* 49 Wis. 162, 5 N. W. 331; *In re Fleming's Petition,* 16 Wis.

70; *In re Incorporation of North Milwaukee,* 93 Wis. 616, 67 N. W. 1033; *Att'y Gen. v. West Wis. R. Co.* 36 Wis. 466; *Black River Imp. Co. v. Holway,* 87 Wis. 584, 59 N. W. 126; *Diana S. Club v. Lamoreux,* 114 Wis. 44, 89 N. W. 880; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851; *Pratt v. Brown,* 3 Wis. 603; *Mills v. Charleton,* 29 Wis. 400; *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295; *Chicago & N. W. R. Co. v. Morehouse,* 112 Wis. 1, 87 N. W. 849; Lewis, Em. Dom. § 166; *Kuehn v. Neroz,* 131 Wis. 610, 111 N. W. 724.

TIMLIN, J.　*Kate Pier* and other owners of land sought to be condemned are appellants, and the *Wisconsin River Improvement Company* respondent.

1. The appellants first challenge the jurisdiction of the judge of the superior court of Lincoln county, and also that of said superior court, to appoint commissioners in condemnation proceedings, contending that ch. 292, Laws of 1880, under which this proceeding was brought, assuming it to be a valid statute, confers that power only upon "the circuit court or the judge thereof." But ch. 295, Laws of 1905, relating to the superior court of Lincoln county, invests that court with "jurisdiction equal to and concurrent with the circuit court of Lincoln county in all civil actions and proceedings at law and in equity," with an exception not relevant here. If we could consider the words "all civil actions and proceedings at law and in equity" as restrictive and as imposing a limitation upon the jurisdiction so as to confine the authority of the superior court of Lincoln county to proceedings in actions at law and proceedings in suits in equity, this construction would be permissible, and perhaps proper; but the words "actions and proceedings" have by statute an extended significance, so that they together cover all remedies to be obtained in courts. Secs. 2594, 2596, Stats. (1898). So the words "at law and in equity" embrace all exercise of

judicial or *quasi*-judicial power on the part of courts, whether that power be conferred upon the courts by statute, common law, or equitable rules. The expression used in the statute must be construed as extensive and general rather than restrictive and particular. This broad grant of jurisdiction is followed by express authority to issue all commissions provided by law, and there is also in the act a provision that whenever any statute of this state shall mention the circuit judge or judge of the circuit court, etc., these words shall be deemed to apply to the judge of the superior court of Lincoln county. We therefore hold that, assuming ch. 292, Laws of 1880, to be a valid law, the power there conferred upon the circuit court or the judge thereof is, by ch. 295, Laws of 1905, conferred upon the superior court of Lincoln county and upon the judge thereof.

2. It is next contended that ch. 292, Laws of 1880, is a private or local act and invalid because the subject of the act is not expressed in its title. Const. art. IV, sec. 18. The title of the act is: "An act to amend ch. 171 of the Private and Local Laws of 1868, entitled 'An act to incorporate the *Wisconsin River Improvement Company,* and to amend ch. 298 of the Laws of 1876, amendatory thereof.'" Ch. 171, P. & L. Laws of 1868, is not entitled "An act to incorporate the *Wisconsin River Improvement Company,*" does not relate to that subject at all, but is an act to authorize the town of Springfield, Dane county, Wisconsin, to establish and maintain a high school. Ch. 298, Laws of 1876, contains in its title the same erroneous reference to ch. 171 of the Private and Local Laws of 1868, but also purports to amend ch. 171, Private and Local Laws of 1866, which last-mentioned act is entitled "An act to amend ch. 30 of the Private and Local Laws of 1853, entitled 'An act to incorporate the *Wisconsin Improvement Company.*'" In the body of the last-mentioned act the corporation is, however, described as the *Wisconsin River Improvement Company.* There was a

statute of 1868 amending the charter of the *Wisconsin River Improvement Company*, but it was ch. 394 instead of ch. 171; so, also, there was a statute numbered 171 amending the charter, but it was enacted in 1866 as aforesaid and not in 1868.

It will thus be seen that in the title to the act of 1880 there is, first, a false description of ch. 171, P. & L. Laws of 1868; second, a correct description of ch. 298, Laws of 1876, which latter contains a false description; and third, a correct description of the subject of the law sought to be amended, as "An act to incorporate the *Wisconsin River Improvement Company*." The body of the act of 1880 expressly confers on the *Wisconsin River Improvement Company* authority to erect and maintain dams at such places as may seem advisable on the Wisconsin river between certain designated points, and to acquire by condemnation proceedings land along the banks of the Wisconsin river for the purpose of facilitating and cheapening the driving and floating of logs, timber, and lumber in said river. Application to the court is necessary, and the court upon such application is required to determine whether said company is entitled to take the whole or any part of the land sought to be acquired. This is similar to the language found in sec. 1847, Stats. (1898). By ch. 194, Laws of 1895, the respondent's corporate existence was recognized, and it was authorized to improve the Wisconsin river in the manner provided in the original act of 1853, or in such other manner as it might deem expedient or advisable, from Stevens Point, Portage county, to the head waters of the Wisconsin river. Assuming, without deciding, that the act of 1880 is private or local, is the subject of that act expressed in the title? The subject of the act is an amendment to the charter of the *Wisconsin River Improvement Company* by conferring thereon the powers aforesaid. The title expressly declares that it is to amend a law entitled "An act to incorporate the *Wisconsin River Improvement Company*," but describes the

latter statute, which it purports to amend, incorrectly, by reference to the chapter number of the act and the year of its passage.    There is in this way a reference in the title of the act to its subject, but coupled with a false description.    Two very ancient maxims of the common law are applicable: *Falsa demonstratio non nocet"* (Broom, Leg. Max. 7th ed. 629 *et seq.*); *Utile per inutile non vitiatur"* (Id. 627). *Madison, W. & M. P. Co. v. Reynolds,* 3 Wis. 287; 26 Am. & Eng. Ency. of Law (2d ed.) 559–583.

Applying another test, it seems to us that any one reading this title would be at once informed that it expressed the subject of the act, which is an amendment to an act incorporating the *Wisconsin River Improvement Company* and also an amendment to an amendment of that act.    Upon further inquiry he would find that the statute of 1868 referred to in the title of the act of 1880 was not entitled as described in the title of the act of 1880; but the same investigation would bring him to ch. 298, Laws of 1876, which would direct him to the original incorporation act, namely, ch. 30, P. & L. Laws of 1853.    Thus he who made no investigation, but heard the title read, would be informed that the act of 1880 was an act to amend the corporate charter of the *Wisconsin River Improvement Company,* and he who made full investigation would inevitably ascertain the exact and true condition of the statutes relative to this corporation.    Therefore neither the casual hearer nor the investigator would be misled, and the requirements of the state constitution are satisfied.

3. It is next argued that the condemnation in question is sought for a private and not for a public purpose; that the private use is the principal or paramount use to be derived from the erection of the dam in question and the real purpose for which this condemnation is sought.    To maintain this contention it is said that the only public purpose which can be considered in the condemnation proceedings in question is the improvement of the river for the purpose of facilitating

and cheapening the driving and floating of logs, timber, and lumber, and that the evidence submitted by respondent on the hearing fails to show that the dam and consequent overflow in question can have this effect. It is further argued that the only purpose of the respondent in the attempted exercise of its power of eminent domain is the creation by means of the proposed dam of a great water power to be sold or used commercially, directly or by electric transmission, at the adjacent cities of Merrill and Tomahawk, and therefore this resort to condemnation proceedings is not in aid of the corporate powers given to or possessed by respondent, but a mere subterfuge through and by means of which the respondent exercises its delegated power of eminent domain, ostensibly for the improvement of the Wisconsin river, but really for the private advantage and gain of the Tomahawk Power Company, a private corporation organized under ch. 86, Stats. (1898).

It was shown that at a meeting of the directors of the *Wisconsin River Improvement Company* on November 5, 1907, a proposed form of contract between that company and the Tomahawk Power Company was submitted for consideration and discussion. Thereupon a resolution was adopted:

"That it be deemed expedient and advisable to improve the navigation of the Wisconsin river between the city of Rhinelander, Wisconsin, and the city of Tomahawk, Wisconsin, by constructing a dam across said river at such height as the president and secretary may determine on sections 25 and 36, in township 35 north, range 6 east, and another dam across the Wisconsin river on sections 1 and 12, in township 35 north, of range 7 east, in Lincoln county; said dams to be provided either with a proper and sufficient lock or marine railway or slide for the safe and convenient passage of boats and other water craft up and down said stream over or through said dam."

The proposed contract between the *Wisconsin River Improvement Company* and the Tomahawk Power Company was then approved and ordered to be executed. It was re-

corded at length as a part of the minutes of the meeting, and recited that the *Wisconsin River Improvement Company* deemed it advisable to improve the navigation of the Wisconsin river from Tomahawk, Wisconsin, to Rhinelander, Wisconsin, and deemed it most expedient to make such improvements by constructing a dam at least fifteen feet in height and not more than twenty-five feet in height as described in the resolution above quoted, and then proceeded as follows:

"Whereas, said dams and improvements will incidentally create water power through use of the surplus water not necessary for the purpose of navigation; and whereas, the Tomahawk Power Company, a Wisconsin corporation, located at Tomahawk, Wisconsin, is desirous of owning such water power to be erected by use of such surplus water, and has begun to acquire the sites for said dams and the major portion of the lands necessary to be overflowed or otherwise used therewith: Now, therefore, in consideration of the premises and of the mutual covenants and agreements hereinafter contained, the *Wisconsin River Improvement Company,* party of the first part, and the Tomahawk Power Company, party of the second part, enter into this agreement."

Then follows the agreement whereby the Tomahawk Power Company binds itself: (1) To make surveys to determine what lands shall be necessary for location of improvements and flowage; (2) to acquire title in its own name to so much of said land as it could purchase at a reasonable price and contribute the use of such land to the enterprise without charge, but to remain the owner of the land; (3) to pay all expenses incurred in carrying on condemnation proceedings for acquiring land and to pay all damages and compensation required to be paid to the owners of the land so taken and all other necessary expenses; (4) to construct and equip in a substantial and permanent manner and put in successful operation such dams with suitable slides or chutes, a lock or system of locks, or a marine slide or railway, as it should elect, of sufficient strength and capacity to pass over, through,

or around said dam, either up or down stream, boats, barges, and other water craft fifty feet in length, ten feet in beam, and drawing five feet of water; (5) to maintain all such improvements in good condition and repair; (6) to have the perpetual right to use in any manner it sees fit all surplus water not needed for navigation, and to raise the said dam at any time permanently or temporarily, but not so as to interfere with navigation, and not exceeding the maximum height aforesaid; (7) to construct in connection with said dam and other improvements all necessary head-races, tail-races, wheel pits, flumes, and other works, and all buildings and power plants necessary for the proper utilization of said surplus water; (8) to assume all liability provided for in ch. 236, P. & L. Laws of 1878, to the owners of any and all property for any damage to such property caused by improper construction of the works of improvement, etc. And the *Wisconsin River Improvement Company* binds itself: (1) To proceed immediately to acquire title or right to overflow the necessary lands by condemnation as provided in its charter, and carry such condemnation proceedings to final conclusion; (2) at its own expense to operate the locks or marine slide, and to do all necessary sluicing of logs, etc., to fix and collect according to law and its charter all tolls and other charges for the use of such improvements on account of navigation.

The evidence fairly supports the inferences from the foregoing contract that the Tomahawk Power Company constructs the dams and river improvements for the *Wisconsin River Improvement Company* at the expense of the former, and in consideration thereof is to reimburse and profit itself by the sale of power. The cost of the first dam will be about $40,000 and it will produce a maximum of about 3,000 horse power. The driving or floating of logs in the Wisconsin river at this point had, prior to and at the time of making this contract, very much diminished from its former proportions. Appellants, in support of their contention aforesaid,

cite *Fallsburg P. & Mfg. Co. v. Alexander,* 101 Va. 98, 43.
S. E. 194, 61 L. R. A. 129; *Avery v. Vt. E. Co.* 75 Vt. 235,
54 Atl. 179, 59 L. R. A. 817; *Brown v. Gerald,* 100 Me. 351,.
61 Atl. 785, 70 L. R. A. 472; *Minn. C. & P. Co. v. Koochi-
ching Co.* 97 Minn. 429, 107 N. W. 405. To get a definite
basis for the examination of the real questions before this
court, we must first ascertain whether the furnishing and sale
of power originated or created by a dam on a navigable
stream is a public use.

The articles of incorporation of the Tomahawk Power
Company are not in evidence, but it was said on the argu-
ment to be a corporation organized under ch. 86, Stats..
(1898). No special charter having been shown, we may
presume it was organized under this general incorporation
statute. Ch. 86, Stats. (1898), authorizes three or more
adult persons, residents of this state, to form a corporation in
the manner provided in that chapter to conduct, pursue, per-
mit, or maintain any one or more of the purposes specified.
Among those specified we find that of furnishing power,
also "heating or lighting or furnishing power or signals by.
electricity or otherwise." This Tomahawk Power Company
may, it is true, under its articles and in conformity to ch. 86,.
*supra,* have other corporate authority, but that is immaterial.
So far as it is a corporation organized to furnish power, that
authority and duty is distinct from any other corporate au-
thority which it may have assumed by additional provisions
in its articles, if such there be. By ch. 499, Laws of 1907
(sec. 1797*m*—1, Stats.), "the term 'public utility' as used in
this act shall mean and embrace every corporation . . . that
now or hereafter may own, operate, manage or control any
plant or equipment or any part of a plant or equipment
within the state for the . . . production, transmission, de-
livery or furnishing of . . . power either directly or indi-
rectly to or for the public. . . . Every utility is required to.
furnish reasonably adequate service and facilities." This.

must mean to such of the public as require this service and imposes the duty to serve the public.

"The charge made by any public utility for any heat, light, water or power produced, transmitted, delivered or furnished, or for any telephone message conveyed or for any service rendered or to be rendered in connection therewith shall be reasonable and just, and every unjust·or unreasonable charge for such service is prohibited and declared unlawful."

Provisions then follow requiring the Railroad Commission to value all the property of such corporation, requiring the corporation to keep and render to the Commission accounts of all business transacted. The Commission is to prescribe the form of books and accounts to be kept, and the corporation is to keep no other books or accounts of its business. It must close its accounts annually and report to the Railroad Commission, who may examine and audit all its accounts, test its appliances for measuring power, etc., enter upon its premises, fix its rates or charges when found to be unjust, unreasonable, insufficient, unjustly discriminatory, or preferential, etc.

There can be no doubt of the power of the legislature to impose such further duties and liabilities upon such corporation as it sees fit, at least with respect to property to be acquired or duties to be undertaken by such corporation after the enactment of the statute. The result of this is that the cases above referred to cited by appellants are not in point, nor is the use of the Tomahawk Power Company a private use. By the statute above quoted the public are entitled to use and enjoy the power created by this dam, not as a mere favor or by mere permission of the owner, but by right. The charges of the Power Company are to be reasonable and to be regulated by the public authorities. These are the tests of a public use. *Shasta P. Co. v. Walker,* 149 Fed. 568; *Minn. C. & P. Co. v. Pratt,* 101 Minn. 197, 112 N. W. 395; also cases cited for appellants *supra.* By the public is

meant, not the whole population of the state, but all persons who require power and are willing to pay reasonable rates therefor to the full extent of the capacity of the enterprise in question. See, also, *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 116 N. W. 4. Public use is not synonymous with public benefit.

We may now more accurately restate the question raised by the evidence as follows: Can a corporation possessing the right of eminent domain to be exercised in aid of navigation by the construction of a dam, after entering into a contract for the construction of the dam with a public-service corporation, whereby the latter is to construct the dam solely at its own expense and to have all the profits arising from the sale of power generated by the dam and the former is to retain the right to collect the tolls arising from navigation and retain control and management of the improvement for all purposes of navigation, exercise such right of eminent domain, it appearing that the rates for power will probably largely exceed the tolls for navigation, and that the corporation possessing the right of eminent domain would probably not have voluntarily exercised that right had it not made such a contract? In the first place, the value of the improvement to navigation is not to be measured alone by the probable amount of tolls to be received, nor does the fact that the revenues to be derived from the sale of power may largely exceed the tolls to be derived from navigation furnish the test of which is the incidental and which the primary purpose of the improvement so far as public interests are concerned. In weighing the motives of the parties these comparisons would be all-important; but a dam may be as effectual in aid of navigation in a case where the owner can get it built by foregoing or assigning his right to some collateral use of that dam as in a case where he is obliged to put up his own money for the construction. The extent of the benefit to navigation cannot be measured by the cost of the dam nor the motives which impelled its construction. Had

the Wisconsin River Improvement Company advanced this
$40,000 and constructed this dam, its charter permitting, it
could itself enjoy these reasonable emoluments to be derived
from the sale of power. In that case the prospective profits
from the sale of power might be a powerful, or indeed the
only, motive or inducement for it to perform its duty in
building the dam; but the court cannot for that reason deny
the right to build the dam if the dam was really in aid of
navigation. Instead of doing this, it procures the dam to be
built in consideration of a transfer of this right to collect
rates for power which it might itself either withhold from
the public or enjoy. It seems to us there is no substantial
difference whether the respondent built the dam by advancing
its own funds or procured it to be built in the manner here
shown, provided the navigation of the river will not be im-
paired by the use of the dam for generating power, and pro-
vided that the dam will be as effective in aid of navigation
with its capacity to generate power and with the sale of
power as without, and provided, further, that the additional
use is a public one, so that condemnation is not sought for a
private use in part or in greater part, as was the case in *Falls-
burg P. & Mfg. Co. v. Alexander,* 101 Va. 98, 43 S. E. 194,
61 L. R. A. 129, and *Minn. C. & P. Co. v. Koochiching Co.*
97 Minn. 429, 107 N. W. 405. The situation here is not
unlike *Lower v. C., B. & Q. R. Co.* 59 Iowa, 563, 13 N. W.
718, which we may cite without wholly committing this court
to the doctrine of that case. See, also, *Ten Broeck v. Sher-
rill,* 71 N. Y. 276, where the canal commissioners under a
power of eminent domain appropriated gravel for the use of
a contractor who was required by his contract to furnish this
material.

4. What would have been the result had the appellants
proved that the dam in question was not in aid of navigation
at all, or had they proved that the dam was built higher than
the facilities of navigation at any season or under any circum-
stances would require, and merely for the purpose of creating

power, and that their lands would not have been flooded but for such excessive and unnecessary height, we need not here determine, because there is no such case before the court.

5. Even where the public use justified the erection of the dam, and the dam, in addition to subserving its public purpose, incidentally caused a surplus of water available for power and for private use, it was held that the public use was not thereby impaired or destroyed. *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 70 Wis. 635, 35 N. W. 529, 36 N. W. 828; *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *Wis. River Imp. Co. v. Manson,* 43 Wis. 255.

In considering cases like this it is to be kept in mind that each of the corporations, *Wisconsin River Improvement Company* and the Tomahawk Power Company, are at all times answerable to the state for nonfeasance or misfeasance in their obligations to the public, and that as against the state no dam could be maintained under respondent's charter which was an impediment to navigation or which was only useful for generating power. The legislature might have conferred upon the Tomahawk Power Company, under its present duties and obligations with respect to the sale of power, the right of eminent domain; but it is not clearly shown that this corporation comes within ch. 277, Laws of 1907. The evidence fails to show that the dam is to be constructed or the land taken for any private use, and the additional public use of generating and distributing power cannot be held to make unlawful the condemnation proceedings in question, which appear by the findings and order of the superior court to be necessary steps in an improvement of the river in aid of navigation, and therefore *prima facie* within the charter powers of the *Wisconsin River Improvement Company.*

*By the Court.*—The order of the superior court is affirmed.

BARNES, J., took no part.