# Richmond

## COMMONWEALTH v. CITY OF RICHMOND.

### March 12, 1914.

1. MUNICIPAL CORPORATIONS—*Taxation—Furnishing Water Outside Corporate Limits—De Minimis.*—The fact that two and one-half *per cent.* of the revenue derived by a city from its water works comes from consumers outside the city limits is *de minimis,* and this court will not further enquire into the right of the city to furnish such water and make such charge as a basis of taxation.

2. TAXATION — *Property of Municipalities — Tax by State — State Policy.*—The settled policy of the State for a long series of years has been to exempt from taxation property lawfully owned and used by municipalities for municipal purposes, and it is not to be presumed that, in framing the Constitution of 1902, the convention intended to depart from that policy. As to such property, exemption is the rule and taxation the exception.

3. TAXATION — *Municipalities—Tax by State—Incidental Profits— Exclusive Use.*—The exemptions from taxation provided for by section 183 of the Constitution of property lawfully owned and held by a city, wholly and exclusively used for city purposes, are not defeated or annulled by the mere fact that revenue or profit over and above the cost of maintenance is realized from the property. If the use made of the property so held has direct reference to the purposes for which it is by law authorized to be owned and held, and tends immediately and directly to promote those purposes, then its use is within the provisions exempting the property from taxation, although revenue or profit is derived therefrom as incidental to its use. The phrase "used wholly and exclusively" in section 183 of the Constitution is not more extensive than the word "exclusively" used in the former statute which the Constitution supersedes.

4. TAXATION — *Municipalities—Tax by State—Incidental Profit— Exemption.*—All property lawfully owned and held by cities and towns for governmental purposes, though a source of

revenue or profit, which is paid into the city treasury and used for municipal purposes by the city, where the dominant purpose in the use has direct reference to the purposes for which the property is authorized by law to be owned and held, and which tends immediately and directly to promote those purposes, is exempt from State taxation. The incidental matter of revenue does not change the nature of the use of such property from a public to a private use.

5.  PUBLIC USE—*What Constitutes.*—The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use which cannot be gainsaid or denied, nor withdrawn by the owner.

Error to a judgment of the Hustings Court of the city of Richmond on a petition by said city to correct an erroneous assessment. Judgment for the petitioner. Commonwealth assigns error.

*Affirmed.*

The opinion states the case.

*Samuel W. Williams, Attorney-General,* and *R. B. Davis,* his assistant, for the Commonwealth.

*H. R. Pollard,* and *Geo. Wayne Anderson,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The commissioner of the revenue for the city of Richmond, in the mode prescribed by law, assessed taxes in favor of the Commonwealth of Virginia for the year 1912, amounting to $35,640.50 upon certain properties and utilities owned by the city, including an auditorium building, water works, gas works and sewerage system, and certain grounds and buildings owned and used by the city for the use and operation of said properties

and utilities, which are set out and described, and the separate values thereof stated, in the assessment made by the commissioner.

Upon a petition filed by the city under the statute, alleging the said assessments to be erroneous, the hustings court of the city entered its order exonerating from taxation all of the property mentioned in the petition; and certified "that all of the said property assessed as aforesaid for State taxes for the year 1912 is property lawfully owned by the city of Richmond and is by said city used wholly and exclusively for city purposes, in furnishing light, water and sewerage to citizens and inhabitants of the city, who pay compensation therefor, all of which compensation is paid to the city treasurer and used for municipal purposes by the city there being an exception in the matter of the American Locomotive Works, whose works are located outside of, but immediately adjacent to, the city limits, which is furnished with water from the city's surplus supply for compensation under like circumstances with the citizens and inhabitants of the city, and that the compensation received by the city is in excess of the cost of the maintenance of the light, water and sewer systems." To this judgment the Commonwealth applied for and obtained this writ of error.

In the petition for the writ of error the Commonwealth abandons her contention made in the trial court, that the "sewerage system of the city, total value $2,250,000, taxes assessed thereon $7,875," was subject to taxation by the Commonwealth; so that the valuation of property belonging to the city on which the Commonwealth now claims that taxes should be assessed, to-wit, the auditorium building, market houses, water works and gas works, is $7,832,500, and the tax assessed thereon $27,765.50.

This contention is rested upon the ground that from each "the auditorium building, the market houses, the water works, and the gas works, the city habitually receives and collects a net revenue largely in excess of the cost of maintaining these utilities, all of which is covered into the treasury of the city and used for its general purposes, which . . . renders each and every one of these properties liable to taxation under the express provision of the Constitution."

It is conceded in the argument here that the city of Richmond, under its charter, is authorized to own and operate the gas works, water works, market houses and an auditorium, which are sought to be taxed in this case, and that these different properties and utilities are "lawfully owned" by the city, and like all other property owned by it are used for city purposes; but it is insisted that though these properties and utilities be held and used for a "governmental purpose" whenever the city derives for such use a revenue or profit to be used in effecting the other public functions or purposes of the city, such properties or utilities cease to be exonerated from taxation by the State.

We deem it proper to set out here the facts appearing in the record, with respect to the maintenance, uses made of the properties in question and the revenue or profits derived therefrom, which facts are not controverted.

(1) *The Auditorium:* The average annual charge during the period of the last five years on the treasury of the city for the maintenance of the ground and building, exclusive of the average interest charge of $2,372.59, is $1,159.34, while the average annual receipts from the same period amount only to the sum of $275.01.

(2) *Market Houses:* The average annual charge during the period of the last five years on the city for maintenance of the grounds and buildings, exclusive of the

annual interest charge on the cost of the same, is $10,232.80, while the average annual income from the receipts is $19,444.44, making a difference of $9,211.66; while the annual average interest charge on the sum invested by the city for the land and buildings is $9,862.-40, thus showing an annual average deficit of expenses and costs over the revenues of $650.74.

(3) *Water Works:* Taking the year 1911, it appears that the total receipts were $254,122.48, while the city spent for maintenance, mains, meters, etc., $181.600.22, leaving a net income of $72,522.26, not taking into consideration, however, the interest on the outstanding indebtedness of the city chargeable against the said works, which interest on $1,370,000 of 4 *per cent.* bonds outstanding in the year 1911 amounted to $54,800, leaving a net income of only $27,722, while if 4 *per cent.* was charged on the whole cost of the works to and including that year, there would be a considerable annual deficit by reason of the operation of the said works.

(4) *Gas Works:* According to the annual report of the mayor of the city of Richmond, the net revenue from the gas works for the year 1911, making no deductions on the bonded indebtedness of the city created to establish the plant, was $205,000, while the net annual income as ascertained by the special accountant was $38,769.70, but making such deduction the result would be practically the same as in the case of the water works.

In this connection stress is laid in the argument for the Commonwealth upon certain facts appearing in the record as sustaining the theory that the city was engaged in "competitive business" in the matter of furnishing water and gas to consumers for compensation, and that the city had gone beyond its charter rights in furnishing water and gas to persons residing beyond its corporate limits. No sufficient reason is given or authority cited

as sustaining the contention that the city had not the right to demand and receive reasonable compensation for water and gas furnished to consumers within its corporate limits—in fact, the charter of the city expressly authorizes it to do so. The circumstances and extent to which the city had departed, if at all, from its charter rights in furnishing water and gas to persons residing beyond its corporate limits, are as follows:

In September, 1909, the adjacent town of Barton Heights presented a petition to the council of the city of Richmond, setting forth that that town was then drilling an artesian well which it expected would be completed within a few months, from which it anticipated to secure an ample supply of water for the needs of the town, but, in the meantime, for the lack of proper water supply, which lack it then faced, as "a serious menace to the health of the community, and the danger of property loss by fire," it urgently requested that, pending the completion of the well, the city of Richmond would enter into an arrangement with it to supply the town with about 40,000 gallons of water daily, on such terms as should seem to the city to be reasonable and fair. After due consideration of the petition the committee on water of the city council recommended the adoption of an ordinance granting to the town of Barton Heights the privilege of using city water in that town, "for a period of three months," the supply to be delivered from a two-inch main, the mains and meters and all material to be of a style and kind satisfactory to the superintendent of the city water works and to be constructed under his supervision; expressly reserving the right before that time to discontinue furnishing water to said town if in the opinion of the superintendent of the water works, or the committee on water, the said water so furnished was "needed for the purpose of supplying water takers in

the city of Richmond, or any other demands within said city.''

By another ordinance approved February 10, 1910, the supply of water to Barton Heights was continued until April 1, 1910, subject to the conditions of the original ordinance, and again, by an ordinance approved April 16, 1910, the period was extended until May 1, 1910, subject to the same conditions, at which last date (May 1, 1910) the right to use city water by that town ceased and has not been granted since. The record also shows that water has been furnished by the city of Richmond to the Richmond Locomotive Works, a branch of the American Locomotive Works, the large and extensive plant of which is located adjacent to the territorial limits of the city of Richmond, at which plant are employed several thousand operatives whose residence is within the city limits.

In addition the city, under practically like conditions, furnishes water to the repair shops of the Chesapeake and Ohio Railroad, the Seaboard Air Line Railway and also to M. T. Cottrell, living on the north side of Broad street adjacent to the city limits, and a few other parties under like conditions. The aggregate amount of revenue derived from so furnishing water to industrial plants and non-residents beyond the city limits for the year 1911 amounted to the sum of $6,455.28.

To what extent non-residents of the city have been furnished with gas does not clearly appear, but it does appear that it was to a less extent than was the case as to water furnished to consumers beyond the city's corporate limits. In comparison with the gross revenue from the city's water works for the year 1911, $254,-122.48, the sum of $6,455.28 received from consumers outside of the city limits for the same year, would seem

to us *de minimis* and as not requiring further considera-
tion.

Under section 3, article 10, of the Constitution of the
State prior to our present Constitution, legislative
action was necessary to exempt certain classified prop-
erty from taxation. The present Constitution, sub-
section (a), section 183, is self-operative and in effect
exempts certain properties, among them, ''Property
directly or indirectly owned by the State, however held,
and property lawfully owned and held by counties,
cities, towns and school districts used wholly and exclu-
sively for county, city, town or public school purposes,''
etc. Sub-sections of section 183 following exempt
certain other classes of property from taxation, putting
limitations upon the right to the exemptive conditions,
among them that property exempted shall be lawfully
owned and used wholly for the purposes for which the
property was acquired and owned.

''The exemptions from taxation provided by section
183 of the Constitution are in accord with the policy of
the State from an early day. The Constitutional Con-
vention, in taking away the power of exemption from
the legislature, did not intend to change the old policy
of the State on the subject, but placed limitations upon
the use of the property exempted so as to prevent the
perversion or abuse of the liberality of the State.''
*Com'th* v. *Lynchburg Y. M. C. A.,* 115 Va. 745, 80 S. E.
589.

In that case, as in this, it was insisted by the Common-
wealth that the provisions of section 183 must receive
a strict construction, but the view taken by the court,
as expressed in the opinion by Buchanan, J., was, ''The
general rule is that provisions exempting property of
individuals or private corporations from taxation must
be strictly construed, taxation of such property being

the rule and exemption from taxation the exception. One of the reasons for this is, that all such persons should bear their fair share of the burdens of taxation, and that lessening the burden of one increases the burdens of the others. But as the policy of the State has always been to exempt property of the character mentioned and described in section 183 of the Constitution, it should not be construed with the same degree of strictness that applies to provisions making exemptions contrary to the policy of the State, since as to such property exemption is the rule and taxation the exception.''

The rule of construction of the provisions of section 183 of the Constitution, applied in the case just quoted from, upon sound reasoning as well as upon authority, applies with greater force where the property sought to be taxed is lawfully owned and used by a municipality which is but a part of the State, exercising for specific purposes a portion of the sovereign power delegated to it, the municipality being but a political sub-division of the State, and such property stands related to the Commonwealth as its own. *Black* v. *Sherwood,* 84 Va. 906, 6 S. E. 484.

Judge Cooley, in his work on Taxation, (3rd ed). pp. 263-4, says: ''Before noticing the exemptions expressly made by law, it will be convenient to speak of some which rest upon implication. Some things are always presumptively exempted from the operation of general tax laws, because it is reasonable to suppose they were not within the intent of the legislature in adopting them. Such is the case with property belonging to the State and its municipalities, and which is held by them for governmental purposes. All such property is taxable, if the State shall see fit to tax it; but to levy a tax upon it would render necessary new taxes to meet the demand

of this tax, and thus the public would be taxing itself in order to raise money to pay over to itself, and no one would be benefited but the officers employed, whose compensation would go to increase the useless tax. It cannot be supposed that the legislature would ever pur posely lay such a burden upon public property, and it is, therefore, a reasonable conclusion that, however general may be the enumeration of property for taxation, the property held by the State and by all its municipalities for governmental purposes was intended to be excluded, and the law will be administered as excluding it in fact.''

The learned author, to sustain his statement just quoted, cited numerous cases, among them *Black* v. *Sherwood, supra,* and *Matter of Hamilton,* 148 N. Y. 310, 313, 42 N. E. 717. In the last named case, after stating that ''property held by the State, or by any of its municipal divisions, for public purposes, is not, and never has been, subject to taxation,'' the opinion says: ''The property to which it holds the title for public purposes stands upon the same footing, in regard to taxation, as that held by the State itself. The end and object of all taxation is to raise revenue for the purpose of defraying the expenses of government, and since no revenue could be raised by imposing taxes on property owned by the State itself, or by any of its political divisions, such property is in no just or practical sense the subject of taxation. It is never supposed to be included in the terms of any law providing for the imposition of taxes, however general it may be, because it is exempt, in the sense in which that term is generally understood, but for the same reason that in the nature of things it never was and never can be taxable. The power of taxation applies to the property of persons, either natural or corporate, within the jurisdiction of the government, and not to the government itself. Public property is non-taxable,

not upon the theory of exemption, but for the obvious reason that there is no law making it taxable. Of course a statute might be enacted including it within the operation of tax laws, but since the government would have to pay the tax itself, such a law would be utterly useless.''

The power of exemption from taxation being in the legislature prior to the adoption of our present Constitution, the statute controlling was section 457 of the Code, as amended by an act approved January 28, 1896, (Acts 1895-6 p. 218) and with respect to property of seminaries and other institutions devoted to purposes of education, used the language, ''devoted exclusively to,'' while section 183 with respect to the exemption from taxation of property lawfully owned and held by counties, cities, towns or school districts, uses the phrase ''used wholly and exclusively for county, city, town or public school purposes.''

In construing section 457 of the Code as amended, *supra,* this court said in *City of Staunton* v. *Mary Baldwin Seminary,* 99 Va. 653, 39 S. E. 596: ''The language of the section when considered as a whole shows that the intention of the legislature was to exempt all real estate from taxation where it or the profits arising from it is devoted exclusively to charitable or educational purposes  .  .  .    The whole of the proceeds arising from the renting of the houses and lots in question being used exclusively for the purposes of the seminary, the houses and lots were exempt from taxation under section 457 of the Code as amended.''

The word ''wholly'' used in the provision of the present Constitution, *supra,* in the same sense it was used in the amended statute superseded by the constitutional provision, adds nothing to the completeness or extensiveness of the word ''exclusively,'' since *wholly* is but

a synonym of *exclusively,* its definition being, "To the exclusion of other things." Webster's Dict. p. 2332.

The exemptions from taxation provided for by section 183 of the Constitution of property lawfully owned and held by a city wholly and exclusively used for city, county, town, charitable, educational or religious purposes, are not defeated or annulled by the mere fact that revenue or profit, over and above the cost of maintenance, is realized from the property. If the use made of the property so held has direct reference to the purposes for which it is by law authorized to be owned and held, and tends immediately and directly to promote those purposes, then its use is within the provisions exempting the property from taxation, although revenue or profit is derived therefrom as incident to such use. *Com'th* v. *Lynchburg Y. M. C. A., supra,* and authorities cited, among them the case of *Com'th* v. *Hampton Inst.,* 106 Va. 614, where it was held that "Hemenway" farm was not liable to taxation, although revenue or profit was derived from the use made of the farm. As said in the case of *Com'th* v. *Lynchburg Y. M. C. A., supra,* "one of the grounds upon which that conclusion was rested was that the institute had the right (by its charter) to establish a model farm for scientific instruction in the dairy business, and that in so using the farm as that it produced revenue or profit which went into the treasury of the school, did not render it liable to taxation, since deriving revenue or profit was a mere incident and not the object in view in so using the farm. The view taken in that case is in accord with the weight of authority in other jurisdictions."

The principle sustained by the "weight of authority," as well as elementary writers, is that all property lawfully owned and held by cities and towns for governmental purposes, though a source of revenue or profit,

which was paid into the city treasury and used for municipal purposes by the city, the dominant purpose in the use having direct reference to the purposes for which the property is authorized by law to be owned and held, and tends immediately and directly to promote those purposes, is exempt from State taxation.

In the case of *Huron W. Wks. Co.* v. *City of Huron,* 7 S. Dak. 9-27, 62 N. W. 975, 30 L. R. A. 848, 58 Am. St. Rep. 817 (citing *Merriwether* v. *Garrett,* 102 U. S. 473, 26 L. Ed. 197) it was held that water works are held in trust for public purposes and could not be sold or taken under execution; that no distinction could be made between the nature of water works property owned and held by a city and public parks, squares, city halls, cemeteries, courthouses and other property owned and held by the city for public use.

Prof. Pond, of Columbia University, in his recent and admirable work on Public Utilities, sections 322 and 323, says: " It is submitted, however, that if within the meaning of the Constitution the providing of these utilities is a public purpose and the property so used is devoted to a public trust, for the acquisition of which money may be raised by taxation because the purpose is a public or municipal one, the property so acquired and used should be entitled to exemption from taxation the same as other municipal property. As a matter of reason if the purpose is such a municipal one, that these plants of the city providing public utilities may be acquired and maintained by taxation, it remains public or municipal from the point of view of the law of taxation, and as a practical business principle the taxing of such property which is acquired and maintained wholly at the public expense by taxation, except as revenue may be derived from its use and operation, is simply taxing the property of the city for its own support with the

6

necessary result that nothing of any net value to the city is acquired to offset the expense of such taxation."

"Nor should the fact that revenue may be derived from the operation of such plants by the city change the principle of their exemption from taxation, for in no sense can that fact alter the nature of the use to which such property is put, nor the purpose accomplished by such use. And this is the test of its being a proper subject of support by taxation and of exemption from taxation. That revenue may be realized from such plants, tending to make them self-supporting, is no reason for subjecting them to the payment by taxation for their own support and that of the government to which they belong. This incidental matter of revenue does not change the nature of the use or purpose of such property from a public one and for municipal purposes generally, to one that is wholly private and that is conducted for the sole purpose of pecuniary profit rather than for the general welfare, and so liable to taxation, . . ."

The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use which cannot be gainsaid or denied, or withdrawn by the owner. *Plecker* v. *Rhodes,* 30 *Gratt.* (71 Va.) 798; *Fallsburg, &c. Co.* v. *Alexander,* 101 Va. 105, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855; *Dice* v. *Sherman,* 107 Va. 424, 59 S. E. 388.

The court is of opinion that there is no error in the order of the Hustings Court of the city of Richmond, complained of here, and that it should be affirmed.

*Affirmed.*