# Wytheville

## CITY OF NORFOLK V. BOARD OF SUPERVISORS OF NANSEMOND COUNTY.

June 10, 1937.

Present, All the Justices.

608

The opinion states the case.

*John N. Sebrell* and *Jonathan W. Old, Jr.*, for the plaintiff in error.

*Charles B. Godwin, Jr.*, and *William M. Birdsong*, for the defendant in error.

Holt, J., delivered the opinion of the court.

In December, 1932, the city of Norfolk, by proper procedure in the Circuit Court of Nansemond county, made application for the correction of, and exoneration from the payment of, certain alleged erroneous assessments of taxes and levies made by the authorities of that county upon that portion of the water works of the city which lay within its limits. That court was of opinion that the city was not entitled to the relief prayed for and from its decision comes this appeal.

The valuation placed upon this property by the county authorities is not challenged; indeed, there are no important issues of fact presented in the record. Those presented are

in the main constitutional and necessitate a re-examination of those provisions which we have often had occasion to consider and which appear in section 183 of the Constitution of Virginia.

Our present Constitution went into effect in 1902. Later there was a general revision of its provisions—see joint resolution of the legislature adopted February 27, 1928 (Session Acts 1928, chapter 46). Exemptions first given from taxation and pertinent changes in those exemptions can best be shown by comparing related sub-sections in section 183 of the Constitution of 1902 and of the Constitution as it stands today.

*Constitution of 1902.*

"Section 183. *Property exempt from taxation.*—Except as otherwise provided in this Constitution, the following property and no other, shall be exempt from taxation, State and local; but the General Assembly may hereafter tax any of the property hereby exempted save that mentioned in sub-section (a):

"(a) Property directly or indirectly owned by the State, however held, and property lawfully owned and held by counties, cities, towns, or school districts, used wholly and exclusively for county, city, town or public school purposes, * * *.

"(g) * * * and whenever any building or land, or part thereof, mentioned in this section, and not belonging to the State, shall be leased or shall be a source of revenue

*Constitution as Amended in 1928.*

"Section 183. *Property exempt from taxation.*—Unless otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes:

"(a) Property owned directly or indirectly by the United States, the Commonwealth or any political subdivision thereof, * * *.

"(g) * * *

"Whenever any building or land, or part thereof, mentioned in this section, and not belonging to the State, shall be leased or shall otherwise be

or profit, all of such buildings and land shall be liable to taxation as other land and buildings in the same county, city or town; * * *."

a source of revenue or profit all of such buildings and land shall be liable to taxation as other land and buildings in the same county, city or town. But the General Assembly may provide for the partial taxation of property not exclusively used for the purposes herein named."

■ By said sub-section (a) in the Constitution of 1902, properties owned by cities, to be exempt from taxation, must be used wholly and exclusively for municipal purposes. No such provision appears in the revision of 1928, and so we think it plain that this omission did not narrow exemptions originally given. Indeed, the revisors of 1928 tell us that no material changes were intended.

Sub-section (g), so far as it deals with exemptions, is not changed at all, save in this: The legislature might limit the right to tax—that is to say, it might provide for partial taxation and for apportionment. This power granted was not immediately exercised and was not exercised until March 25, 1930 (Acts of Assembly 1930, ch. 397, p. 833; Tax Code, section 435a).

■ This Code provision could neither enlarge nor contract constitutional limitations and could only deal with the proper assessment and distribution of taxes lawfully levied. It gave no new right to levy and could not come into operation until after a lawful levy had been made.

Norfolk's water works system was established in 1872 and has since been constantly enlarged to meet increasing demands. Lake Prince was added in 1922. An interesting account of its continuous development appears in the record. Some small sources of supply have been abandoned because their use was uneconomical and much of the work once done has become obsolete. There were two other water companies in this vicinity, the Norfolk County Water Company and the Portsmouth, Berkley & Suffolk Water Company. They appear to

have been failing ventures and were taken over by the city, and it was from the latter company that Lake Prince was purchased.

In 1919 city demands for the use of its own inhabitants had grown to such an extent that a water famine was imminent and the necessities of the city were urgent. It was this which led to the purchase and development of Lake Prince in Nansemond county. That source of supply became available in 1922 and from it now comes about fifty per cent of the city's water.

It, the county now contends, should pay county taxes, although no effort to levy such a tax was made for ten years. Acquiescence in this interpretation of the county's rights by those charged with the administration of its affairs, while not conclusive, is valuable. *Superior Steel Corp.* v. *Commonwealth*, 147 Va. 202, 136 S. E. 666; *Houghton* v. *Payne*, 194 U. S. 88, 24 S. Ct. 590, 48 L. Ed. 888.

This general rule also should be remembered: Exemption from the burden of taxation extended to individuals or private corporations must be strictly construed. But this rule does not apply to property like that mentioned in section 183. The policy of the State has always been to exempt it. Property held by the State or by a political subdivision of it and for a public purpose has never been dealt with as if it were a private venture. To do so would be in substance a tax by the State upon itself.

In *Commonwealth* v. *Lynchburg Y. M. C. A.*, 115 Va. 745, 80 S. E. 589, 590, 50 L. R. A. (N. S.) 1197, Judge Buchanan said:

"The exemptions from taxation provided for by section 183 of the Constitution are in accord with the policy of the State from an early day. The Constitutional Convention, in taking away the power of exemption from the legislature, did not intend to change the old policy of the State on the subject, but placed limitations upon the use of property exempted so as to prevent the perversion or abuse of the liberality of the State.

"It is insisted by the Commonwealth that the provision of section 183 of the Constitution must receive a strict construc-

tion. The general rule is that provisions exempting property of individuals or private corporations from taxation must be strictly construed, taxation of such property being the rule and exemption from taxation the exception. One of the reasons for this is that all such persons should bear their fair share of the burdens of taxation, and that lessening the burden of one increases the burdens of others. But as the policy of the State has always been to exempt property of the character mentioned and described in section 183 of the Constitution, it should not be construed with the same degree of strictness that applies to provisions making exemptions contrary to the policy of the State, since as to such property exemption is the rule and taxation the exception."

We look to the Constitution of 1902 in determining the validity of the assessment made in 1928. Succeeding assessments are governed by the Constitution as it stood amended in 1928. Assessment for 1929 was made under it; those for all succeeding years were likewise made; but those made after 1929 are also affected by and subject to the limitations imposed by the apportionment statute of 1930, which of course is not retroactive.

Is the assessment made in 1928 valid? We have seen that under sub-section (a) of section 183 property to be exempt must be owned and held by the city, and it must be "used wholly and exclusively" for city purposes. Under sub-section (g) it may also be taxed if it "be leased or shall otherwise be a source of revenue or profit" to the city.

There is no question as to ownership, but it is contended that this supply of water is not used wholly and exclusively for city purposes. That qualifying provision turns upon the uses to which this property has been put. While use and not profit is the test, yet the absence of a purpose to profit at times tends to clarify the nature of the use, and an unauthorized use may be too small to notice.

In *Commonwealth* v. *City of Richmond*, 116 Va. 69, 81 S. E. 69, 72, L. R. A. 1915A, 1118, it appears that the Commonwealth in 1912 undertook to levy a tax upon certain properties and utilities owned by the city, including its water works. The city's total receipts from that source for 1911

were $254,122.48, and in that year there was received from water consumers outside the city's limits $6,455.28. With these figures before it the Commonwealth's claim received short shrift. The court said that these outside receipts "would seem to us *de minimis* and as not requiring further consideration." It did, however, go on to say:

"The principle sustained by the 'weight of authority,' as well as elementary writers, is that all property lawfully owned and held by cities and towns for governmental purposes, though a source of revenue or profit, which was paid into the city treasury and used for municipal purposes by the city, the dominant purpose in the use having direct reference to the purposes for which the property is authorized by law to be owned and held, and tends immediately and directly to promote those purposes, is exempt from State taxation."

And in support of that conclusion is cited with approval this statement from Professor Pond's work on Public Utility:

"Nor should the fact that revenue may be derived from the operation of such plants by the city change the principle of their exemption from taxation, for in no sense can that fact alter the nature of the use to which such property is put, nor the purpose accomplished by such use. And this is the test of its being a proper subject of support by taxation and of exemption from taxation. That revenue may be realized from such plants, tending to make them self-supporting, is no reason for subjecting them to the payment of taxation for their own support and that of the government to which they belong. This incidental matter of revenue does not change the nature of the use or purpose of such property from a public one and for municipal purposes generally, to one that is wholly private and that is conducted for the sole purpose of pecuniary profit rather than for the general welfare, and so liable to taxation."

All of this the court must have thought applied to the Commonwealth's claim there asserted. The fact that Richmond furnished water to Barton Heights and to near-by industrial plants did not change the character of the use.

In *Board of Supervisors* v. *Norfolk*, 153 Va. 768, 151 S. E. 143, 146, this court said:

"So long as the dominant purposes for which the lands were purchased are maintained, incidental uses which serve in some small degree to lessen the city's burdens although foreign to, but not in derogation thereof, and which do not change the character of the holding, are not sufficient to bring them within the exception noted in the Constitution, and to make them a subject for taxation."

Although it is true that we held the receipts there to be *de minimis.*

In *Commonwealth* v. *Trustees of Hampton Normal & Agricultural Institute*, 106 Va. 614, 56 S. E. 594, an attempt was made to tax, among other properties of the Hampton Normal & Agricultural Institute, what was known in the record as the "Hemenway" farm. On it, for the instruction of its pupils, the Institute established a model dairy farm and from it there was received something like $9500 a year for products sold to outsiders, but it was held that this large income was but an incident of an undertaking whose dominant purpose was the instruction of its pupils. It was the use to which this farm was put, independent of profits derived from its operation, not here *de minimis,* which warranted an exemption.

Recently we have had occasion to consider the principles involved. In *Light* v. *City of Danville, ante,* page 181, 190 S. E. 276, the right of eminent domain was upheld. Danville is undertaking to establish a hydro-electric plant in a distant county. Already that city is supplying electricity to its urban community, part of which is outside of its corporate limits, and it was conceded that this custom would be continued when the new plant had been established. The court was of opinion that this extra-urban use was but an incident of a major and dominant purpose. Plainly Danville could not condemn land in furtherance of a venture whose purpose was to supply outside consumers. The right to condemn was upheld because the dominant design was a public use. Compare *Shoemaker* v. *U. S.*, 147 U. S. 282, 297, 13 S. Ct. 361, 37 L. Ed. 170.

Of course there must be reason in all things. Ashland, to supply itself with water, could not dam James river and out of its surplus serve all the needs of Richmond.

If built-up settlements contiguous to Norfolk were not furnished water for domestic uses, for sewerage purposes and for fire protection, they would soon become a menace both to its safety and to its health, and so such service is but incidental to Norfolk's major purpose, which was never one for profit, major or minor.

We have seen that Lake Prince was acquired because of an urgent present municipal demand. A water famine was at hand and that situation differentiates this case from the Newport News cases, *Warwick County* v. *Newport News*, 153 Va. 789, 151 S. E. 417, and *Newport News* v. *Warwick County*, 159 Va. 571, 166 S. E. 570, 167 S. E. 583.

The Newport News Light & Water Company and the Old Dominion Land Company were private allied corporations organized for profit and controlled practically the entire sources of water supply in the lower peninsula of Virginia. They supplied the city of Newport News, the city of Hampton, the town of Phoebus, Buckroe Beach, the town of Kecoughton, Hilton Village, Fort Eustis, the settlement at Old Point and intervening suburban communities with water.

Newport News undertook to purchase this system, actuated doubtless by a desire to supply itself and to profit by outside operations. This it did, acting under authority given by its charter, general laws and a special act of the General Assembly approved March 25, 1926 (Acts of Assembly, 1926, ch. 530, p. 880). Under obligations imposed by this act on Newport News are these:

"2. Upon the purchase of said water works plant by the city of Newport News, the said city shall continue to serve all corporations or persons now being supplied with water by said water works system in York county, James City county, Warwick county, Elizabeth City county, the city of Hampton, the town of Phoebus and United States to supply water to Fort Eustis, Navy mine depot, Langley aviation field, Fortress Monroe and the National Soldier's Home, upon such terms and conditions as may be agreed upon."

This dual consideration, a purpose to profit and the obligation to serve outside interests, runs like a *leitmotif* through all the Newport News water cases.

Acting upon authority conferred and upon limitations imposed, it sells about one-third of its supply to outside consumers. *Warwick County* v. *Newport News*, 153 Va. 789, 151 S. E. 417.

The case of *Newport News* v. *Warwick County*, 159 Va. 571, 166 S. E. 570, 582, 167 S. E. 583, is the authority reluctantly relied upon by the Judge below, and so it is important that we know its scope. Speaking through Mr. Justice Chinn, in conclusion, it is said:

"In view of the conclusions expressed, we are of opinion that the judgment of the trial court should be affirmed, in so far as it holds that the lands and buildings thereon, belonging to the city of Newport News as a part of its water works system, situated in Warwick county, were a source of revenue or profit to said city of Newport News during the year 1928, within the meaning of section 183 of the Constitution, as amended, and liable to taxation by Warwick county for the year 1929; \* \* \*."

These profits he elsewhere states must be substantial.

The situation is further clarified by this observation of the Chief Justice made upon petition to rehear:

"\* \* \* the court deems it only necessary to say that the opinion in question expressly applies the construction therein placed upon the amended section (183) of the Constitution to the facts and circumstances of the case under consideration, and does not undertake to apply such construction to a situation in which a municipality owns and operates a water works system wholly and exclusively for its own municipal purposes. \* \* \*"

Plainly the sale of water by Newport News to outlying communities was not incidental; it was in response to a statutory mandate, and profits for the year in judgment were found by the court to be $77,892.76. Assuming that this finding of fact is accurate, liability to taxation follows as a matter of course.

Norfolk's service to its suburbs was incidental to the purpose for which Lake Prince was acquired and served to protect itself in the manner noted, possibly with the exception of Virginia Beach whose purchases amounted to $10,000, which compared to the magnitude of the city's operations was inconsequential.

Mr. W. P. Jordan, a certified public accountant testifying for the county, has placed in evidence a statement showing income and expenses for the years in judgment. Speaking in thousands, the city received from water rents for the year 1927 $827,000, including receipts from outside sources, in amount $53,000, which is something less than 7% of its gross water rate income. Rates to outsiders are higher, the cost of service was high, and so it is probable that only 6% or less of water used was thus consumed. We think this is *de minimis*, and if it were not, the city should not be taxed, because this use in any aspect of this case was, as we have seen, but incidental. It was not made for profit—there was no profit—and it was not made in response to any statutory mandate.

Has this water works system been a source of revenue or profit as defined in sub-section (g) of section 183 of the Constitution of 1902?

Certainly "revenue" and "profit" are not, as these terms are commonly used, synonyms, and so it may be argued that the city has received revenue from its water system. Certainly it has received more than $800,000 from that source.

These terms, however, we have already construed. In *Commonwealth* v. *City of Richmond, supra,* there was a revenue of over $250,000, and yet that revenue did not warrant the imposition of taxes, while *Newport News* v. *Warwick County, supra,* proceeds upon the theory that there must be substantial net profits. Not until there have been charged against and deducted from the gross income all proper charges and expenses, and not unless there then remains a substantial net profit, can there be any taxes assessed against a city under said sub-section (g).

Expert accountants have been examined at length, both for the city and for the county. Any detailed discussion of the many items covered would be endless and fruitless.

For convenience, we shall deal with thousands only. Mr. Breeden's estimate of gross receipts for the year 1927 is $842,000. Mr. Jordan puts those receipts at $854,000. From each of them should be deducted a $6,000 item received from the sale of fishing privileges in Lake Prince. This was an incidental income, just as was the sale of milk from a model dairy farm, established for the use and instruction of students at the Hampton Institute, in amount, $9,000. If the Institute should not be charged with that $9,000 in estimating its income, Norfolk should not be charged with this $6,000. Fish from Lake Prince and milk from the Hampton farm are sources of income not contemplated when they were acquired. Deducting this item of $6,000, the receipts of both these experts are, respectively, $836,000 and $848,000.

Mr. Breeden states that the expenses of operation were $853,000. That estimate includes a sinking fund annuity of $161,000, which, for reasons hereafter to be stated, should be stricken out. To it for like reasons should be added a depreciation item of $210,000. Making these changes, the city's expenses were $902,000.

Mr. Jordan puts operating expenses at $237,000, to which he adds interest on bonded debt, $455,000, making an aggregate of $692,000. If to this be added a depreciation item of $210,000, his estimate of expenses also aggregates $902,000.

Making the changes indicated in Breeden's estimate, the city lost for the year in judgment $66,000, and according to Jordan's estimate it lost $54,000.

The county, however, contends that the item of $210,000 should not be allowed. The evidence of the city fixes the amount, but the county claims that a charge of this character should not be admitted at all; that against profit should be charged only current repairs and replacements. It also claims that there should be charged against the city for the city's use of water, for fire protection, etc., $148,000.

If this contention be sound, these results follow: The city's gross receipts were $848,000. If we add to it said item of $148,000, its receipts were $996,000, while its expenses were but $692,000, from which it would follow that the city's profits were $304,000.

We are, therefore, to determine if the sinking fund annuity of $161,000 should be allowed, if the depreciation item of $210,000 is to be allowed, and if there should be charged against the city said item of $148,000.

█ █ A sinking fund is a sum set apart out of current net income to meet a present obligation which has not yet matured, but which will mature at some future stated date. *Sinking Fund Cases*, 99 U. S. 700, 25 L. Ed. 496; 58 C. J. 738. If the debt and its maturity were not known, there could be no intelligent estimate of the necessary sinking fund annuity. Since it is taken out of current net income, it is a part of that income and must be included in any statement of a corporation's actual income for any given year. A corporation might be highly prosperous and yet its obligations and their maturity might be such that a proper sinking fund annuity would for a stated time absorb its entire income. We think, for these reasons, that the city is not entitled to the credit claimed for the item of $161,000.

█ █ We are to determine what credit or allowance, if any, is to be given the city for depreciation or replacements over and above current repairs. "Depreciation may be defined as the loss in value of some destructible property over and above current repairs." *Cumberland Tel. & Tel. Co.* v. *City of Louisville* (C. C.) 187 F. 637, 653.

"A water plant, with all its additions, begins to depreciate in value from the moment of its use. Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its

plain duty to the public." *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 29 S. Ct. 148, 152, 53 L. Ed. 371.

"The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost." *United States* v. *Ludey*, 274 U. S. 295, 47 S. Ct. 608, 610, 71 L. Ed. 1054.

A public utility rate, which takes no notice of such an allowance, may be confiscatory. *Columbus Gas & Fuel Co.* v. *Public Utilities Commission of Ohio*, 292 U. S. 398, 54 S. Ct. 763, 91 A. L. R. 1403, 79 L. Ed. 1327.

Its appearance in the annual balance sheets of all large corporations may be said to be a universal practice. We have approved it in principle as a proper practice. Judge Campbell, in *Lehigh Portland Cement Co.* v. *Commonwealth*, 146 Va. 146, 135 S. E. 669, 670, said:

"We have followed with keen interest the able argument of counsel for the plaintiff, and feel impressed that in most cases an assessment based upon 100 per cent of the original value of the taxable property, less annual depreciation, as denoted, would afford an equitable basis of taxation. But this argument ignores the plain provisions of section 169 of the Constitution of Virginia, which provides that 'all assessments of real estate and tangible personal property shall be at their fair market value.' "

There the court held that the company's real estate should be assessed at its fair market value, tempered by the manner in which other real estate in its community was assessed. That, however, is wholly apart from net income for a current year.

In *Warwick County* v. *Newport News, supra,* it appeared that $75,354.20 was set aside for such a purpose to cover an eighteen-month period.

In forms for corporate income tax returns prepared by the Commonwealth, among deductions there allowed is this provision:

"19. Depreciation.—Fill in Schedule H and enter as Item 19

the amount claimed as depreciation resulting from the exhaustion, wear and tear, or obsolescence, of the property used in the trade or business. The law provides that only a reasonable allowance is deductible as such depreciation. It also provides that no deduction shall be allowed for any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made. (Sections 25 and 26, Tax Code of Va.)"

Such an allowance is proper and is sustained by the overwhelming weight of authority, although it was not made in *Newport News* v. *Warwick County, supra.*

In the instant case, wooden conduits rot, electrolysis sets in and iron mains rust away. Pumps and provisions for purification become obsolete or give place to more efficient instrumentalities. Silt accumulates and the plant becomes outworn. This slow deterioration cannot be covered by current repairs and replacements, and so if note be not taken, the city in time will find itself without water and without water works. Construction would have to begin anew.

 The city has also been charged with an annual item of $148,000, services to itself, such as fire protection, sewer flushing, street cleaning, etc. As a matter of fact, water used for these purposes at current rates would cost less than $5,000. Unquestionably the city is benefited by such service and profits by it. Pestilence might set in from unflushed sewers and the first fire that started might burn the city down, and this applies alike to the city itself and to contiguous built-up suburbs. Not a dollar of profit from this source has come into the treasury and no extravagance is charged in the maintenance of the service, which is distinctly governmental.

"No higher police duty rests upon municipal authority than that of furnishing an ample supply of pure and wholesome water for public and domestic uses. The preservation of the health of the community is best obtained by the discharge of this duty, to say nothing of the preservation of property from fire, so constant an attendant upon crowded conditions of municipal life." *Columbus* v. *Mercantile Trust & Deposit Co.,* 218 U. S. 645, 658, 31 S. Ct. 105, 109, 54 L. Ed. 1193.

The principle which we rely upon is forcefully set out in an opinion of the Supreme Court of date March 15, 1937, where it is said:

"We conclude that the acquisition and distribution of a supply of water for the needs of the modern city involve the exercise of essential governmental functions, and this conclusion is fortified by a consideration of the public uses to which the water is put. Without such a supply, public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths, could not exist. And this is equivalent, in a very real sense, to saying that the city itself would then disappear." *William Whitlock Brush* v. *Commissioner of Internal Revenue*, 300 U. S. 352, 57 S. Ct. 495, 500, 81 L. Ed. ——.

"* * * water works are held in trust for public purposes * * *." *Commonwealth* v. *Richmond, supra.*

This conclusion, as the *Brush Case* tells us, is not in conflict with those cases which hold cities liable in tort for negligence in the conduct of this business.

The city should not be penalized because it has discharged with fidelity a public trust.

It was never intended by the city that its water works system should be a source of profit. That charge against it and these paper profits are as unsubstantial as a Barmecide feast.

With depreciation charges added and with those for fire protection stricken out, under no plausible basis of calculation can a profit be established against the city for any of the years here in judgment.

The city, under act approved March 3, 1924 (Acts of Assembly, 1924, ch. 87, p. 88), constructed a water main to Virginia Beach at a cost of $200,000. For this outlay Virginia Beach was to pay $12,000 a year, which said statute declared to be interest on the outlay. This was not a city profit, and if it were so declared, it would not affect the conclusions we have heretofore reached.

If the county of Nansemond were to prevail in this litigation, then Isle of Wight and all other counties from which it

draws its water supply would of course be entitled to equal relief.

In conclusion, we again draw attention to a policy of the State which has always prevailed: Taxes are not to be assessed against it or its subdivisions unless the right to tax is made plain. Nor is this affected by the fact that county property may be withdrawn from taxation. *Rudacille* v. *State Commission*, 155 Va. 808, 156 S. E. 829. In the Shenandoah Park hundreds of thousands of acres are in this manner exempt.

The judgment of the court below should be reversed and the cause remanded. It is so ordered.

*Reversed and remanded.*

CAMPBELL, C. J., and HUDGINS and SPRATLEY, JJ., dissenting.

SPRATLEY, J., dissenting.

The city of Norfolk in its municipal capacity owns and operates a waterworks system. It claims, and it is not contradicted, that its primary and dominant purpose in acquiring this system was to supply water to itself and its inhabitants. In doing this, in addition to the lands acquired in several surrounding counties, including Nansemond county, it took over two other water companies in its vicinity. It has since then supplied the communities formerly served by these companies and the communities and citizens along its pipe lines, several federal reservations, numerous public carriers, and fire protection service to the city of South Norfolk and Norfolk county. It has, in addition, extended its mains to Virginia Beach, the most prosperous seaside resort in this State, twenty miles or more eastwardly from the city of Norfolk. This extension required the laying of pipe lines from the city reservoir in Princess Ann county, itself five miles from the city limits, to Virginia Beach, fifteen miles farther away from the city. This extension required the expenditure of $200,000 of money, for which the water department receives $12,000 per year as

interest and amortization, in addition to a revenue from consumers at Virginia Beach running from $10,000 in 1927 to over $13,000 in 1931. Without including $6,000 as rent from surplus land and for fishing permits, $60,000 as water revenue from federal reservations and public carriers, steamships, railroads, etc., and the above mentioned item of $12,000, the city has received annually for water service from sources outside of the city, in round numbers amounts running from $33,000 in 1927 to over $80,000 in 1931. During the same period, its gross receipts increased from $841,000 to over $872,000.

Upon the trial of the case, the city filed in the record a statement of the operation of its waterworks department. It included as an item of expense for a sinking fund annuity the sum of $160,000 to $170,000 for each of the several years. It carried the cost of current repairs, maintenance and ordinary replacement of original parts in its item of ordinary operation, but carried no item of deduction for general depreciation and obsolescence. Although the city billed itself for water used in its municipal buildings, the statement shows no charge made for fire protection service to the city, although it had 1,235 fire hydrants in 1927 and 1,305 in 1931. The record shows an increased rate of service is charged to those outside of the city. The book value of the plant is given at $11,545,-781.20 for 1927, with bonds outstanding amounting to $9,415,821.65, with a sinking fund in hand amouting to $1,483,015.16. In 1931 the book value had increased to $11,-838,119.72; the bonds outstanding to $9,647,821.65 and the sinking fund had increased to $2,446,122.83. Bonds amounting to $673,050.38 were retired during the year 1931, and in 1933, while the book value had increased to $11,900,634.68, the outstanding bonds were $8,974,771.27 and the sinking fund had risen to the amount of $2,258,754.26, leaving a net bonded indebtedness of $6,716,017.01. Repairs for the seven-year period from 1927 to 1933, inclusive, amounted to over $88,-000, while capital additions and replacements for the same period amounted to $454,000, making an average of $77,000 a year for all repairs, replacements and capital additions. In giving the amounts received from outside sources, there has

not been included the amount sold to federal reservations within the city limits, nor to railroads, steamship and ferry companies located therein. The city's statement of operations shows that after deducting ordinary expenses, including cost of operation, current repairs, maintenance and ordinary replacements, and interest on the bonded debt, and without making any charge for fire protection service, or deducting any sinking fund annuity, there was a profit in round numbers of $149,000 in 1927, $138,000 in 1928, $150,000 in 1929, $166,000 in 1930 and $151,000 in 1931.

Except as to the extent of the use, measured by the amount of the revenue received, this case contains the same material facts, and is almost identical with that of the *City of Newport News* v. *Warwick County*, 159 Va. 571, 166 S. E. 570, 167 S. E. 583. Newport News acquired the property of a water company under an act of the General Assembly, which authorized it to do a water business outside of the city. Norfolk acquired the property of two water companies, and under an amendment to its charter, Acts 1916, ch. 229, p. 449, it was authorized to "contract with individuals, * * * and other municipalities for the use of such water * * *," in the conduct of the water business thus acquired. In neither that case, nor in this one, does the test of taxability turn upon what the owner may intend to do with the property, but upon what is being done with it.

In the consideration of this case, as I see it, there is no constitutional question involved, nor is there any interpretation required because the words are explicit. We are required only to give plain and simple words their ordinary and common meaning in popular acceptance. We have nothing to do with the wisdom, policy, or expediency impelling the makers of the Constitution in drafting the fundamental law. Whether the law, as written, be harsh or unjust, contrary to "ancient usage", or contrary to expediency, as we view it, we cannot correct same, or relieve against it. If the language of the Constitution expresses its intention with a meaning perfectly plain, effect should be given to all of the language conveying such intention, since that intention constitutes the will of the

makers of the law and is supreme. We ought not, under any guise of construction, to mould the expression into a shape which we think it ought to bear. Black on Interpretation of Laws.

While it seems to me only necessary to give consideration to the Constitution of 1902, as amended in 1928, it may be interesting and illuminative to consider the Constitution prior to its amendment and the cases decided thereunder. Under section 168, all property except as thereinafter provided is subject to taxation. The subsequent exemptions are continued in section 183.

Sub-section (a) of section 183, prior to the amendment, expressly exempted the property of the State, "however held," without limitation, and exempted the property of political subdivisions subject to the qualification or limitation that it be "used wholly and exclusively" for the "purposes" of the political subdivision. This latter qualification or limitation was further emphasized by sub-section (g), which provides a measure of taxation when any building or land *not belonging to the State* "shall be leased or shall be a source of revenue or profit."

After the amendment of section 183 in 1928, property of the State was still exempt without qualification, while property *not belonging to the State* remained subject only to the foregoing limitation or qualification in sub-section (g), the limitation in sub-section (a) being omitted.

There can be little doubt, therefore, that it has been the policy of this Commonwealth to place limitations upon the exemption from taxation it allowed its political subdivisions as distinguished from the complete exemption allowed State-owned property. The omission to include city-owned property in the same class as State-owned property and the decisions of this court since *Black* v. *Sherwood*, 84 Va., 906, 6 S. E. 484, clearly evidences such policy. But even if their policy had been otherwise, certainly the State could change its "ancient usage" as it has so frequently done in many instances to meet changed conditions.

In the several cases decided by this court prior to 1928,

requiring a construction of the Constitution as then written, it was held that the test of the taxability of property owned by a city, or by an educational, or religious institution, turned upon the use to which the property was put. In these former decisions, the construction was based upon sub-section (a) without reference to sub-section (g). The words "used wholly and exclusively for county, city, * * * purposes," were held to have a fixed and definite meaning referring to the use and purpose. *Newport News* v. *Warwick County, supra.* Yet, in the cases of *Board of Supervisors of Nansemond County* v. *Norfolk,* 153 Va. 768, 151 S. E. 143, and *Warwick County* v. *Newport News,* 153 Va. 789, 151 S. E. 417, the amount of revenue or income received was taken into consideration in determining the use. In the *Nansemond County Case, supra,* the revenue from a leasehold was held to be *de minimis,* and the property not taxable. In the *Warwick County Case, supra,* the revenue was held to be substantial, and the property taxable.

Notwithstanding my difficulty in following the reasons advanced by the court in deciding the cases prior to 1928, I am disposed upon the principle of *stare decisis* not to further question those decisions. It seems to me more important for the certainty and stability of judicial construction, to adhere to the rule that the nature of the use determined the taxability in all cases arising prior to 1928. For that reason, I am disposed to agree with so much of the opinion of the majority as exempts the property in question here from taxation for the year 1928, since the amendment did not become effective until the latter part of that year.

The validity of the assessment for 1929 must be determined under the Constitution, as amended in 1928. The taxability for 1930 and subsequent years must be determined under the amended Constitution, and the measure, if any, fixed and provided by Tax Code, section 435a.

It will now be observed that in the amendment of 1928, there was removed from sub-section (a) of section 183, the words "used wholly and exclusively for county, city, * * * purposes." Under the new section, property of both the State and its

political subdivisions, is exempt, without any reference to the use thereof, with the qualifying provision in sub-section (g), that whenever such property *"not belonging to the State* shall be leased or shall otherwise be a source of revenue or profit," it shall be liable to taxation. In sub-section (g), the word "otherwise" is added, together with another provision for partial taxation in the discretion of the General Assembly. Tax Code, section 435a (copied in the margin), was enacted in pursuance thereof, effective for the year 1930, and thereafter.*

As was said in the *Newport News Case, supra,* the removal of the above words in sub-section (a) presented a different question. The only qualifying provision remaining is sub-section (g). It appears that in accordance with the intention of the revisors of the Constitution, the changes were made in the interest of clearness and brevity, and the qualifying words in the original sub-section (a) were eliminated because the language in sub-section (g) made it, to some extent, superfluous. There is no evidence of any intention to broaden the exemption from taxation allowed political sub-divisions.

---

*Tax Code, section 435a. In the event any land or buildings constituting any portion of any water system or other public utility owned directly or indirectly by any political subdivision of the State, shall be legally assessable for taxation by any political subdivision other than the owner of said public utility, such property located without the limits of said owner shall be assessed only for the portion of fair market value thereof in the proportion that the gross revenues of said utility derived from consumers outside of the limits of the owner bears to the gross revenues derived from the whole utility; said proportion for the year nineteen hundred and thirty and for each succeeding year to be based on the gross revenues of the year next preceding, and the commissioner of revenue shall each year so extend the assessment on his books.

This act shall apply to and be the basis for taxation of such property for the year nineteen hundred and thirty and each year thereafter.

The owner of such utility shall annually on or before April first make report to the commissioner of the revenue of the county in which any of such property is located showing the gross revenues of said utility derived from consumers outside of the limits of the owner as well as the gross revenues derived from the whole utility, and the books of said owner shall at all reasonable times be open to the inspection of the commissioner of the revenue of any such county for the ascertainment of such proportion of the revenues.

After the amendment of 1928, we then have in clear language this situation: Property owned by the United States and the Commonwealth of Virginia, is wholly exempted without any qualification. Property owned by political subdivisions of the State is exempt from taxation, unless it "shall be leased or shall otherwise be a source of revenue or profit." Both reference to "use" and "purpose" is eliminated. The revenue or profit is not required to be "substantial"· or "net", in order to take the property out of the exemption, nor is there anything to indicate an intention that the words "dominant" or "incidental" shall be applied to revenue or profit, or to a "use" or "purpose". The word "otherwise" in sub-section (g) has a meaning broad enough to cover every instance where the property is used to yield revenue or profit other than by way of lease.

There is no longer any necessity to determine whether or not the property is being "used wholly and exclusively" for "city purposes". The amount of the revenue yielded from sources outside of the city is not a controlling factor on the question of taxation, but is a measure of the amount of taxation, made further dependent upon the will of the legislature. Whether the property is used as a source of revenue or profit, is now the sole limitation or qualification and the test of the exemption. If it yields either, it is to that extent without the exemption, regardless of the fact whether the revenue is incidental or sufficient to yield a profit.

The new provision that the General Assembly may provide for the partial taxation of non-exempt property, is an added recognition by that body of the fact that city-owned property is not wholly exempt. While it is true that Tax Code, section 435a, cannot enlarge or contract constitutional limitations, however, it does place a construction upon the Constitution justified by its language, and provides a measure of taxation authorized by its provisions.

The words relating to the use, upon the construction of which the court formerly held that the question turned, having been eliminated, it was realized that the whole property would become liable to taxation if a source of any revenue or

profit, and that in some instances, perhaps, the revenue would not be as great as the tax. Therefore, this discretion was given to the General Assembly. The fairness of the legislative mind is evident when it made the measure of taxation dependent upon the amount of outside revenue as compared with the gross revenue. The effect of such provision will be illustrated in figures hereinafter given.

The citation in the majority opinion from Pond on Public Utilities, is an argument and an assignment of reasons for the adoption of a policy, which would exempt municipal plants from taxation. It does not refer to constitutional or statutory provisions. It should, however, be referred to the makers of the law rather than to the courts. The policy or expediency of such taxation has been passed upon by the authors of the Constitution of Virginia, and they have determined the conditions under which such property shall be subject to taxation.

In eminent domain cases, one of the essential requirements is that the property sought to be condemned must be devoted to a public use. The case there always depends on the use. No such requirement is involved in the principle of taxation. In Virginia, as we have seen, under the Constitution, all property is subject to taxation, except that which is therein specifically exempted, and exemptions are usually strictly construed. The test in Virginia for condemnation of property by a public service corporation, is a public use, but that does not exempt the public service utility from taxation.

We may readily agree that the words "revenue" and "profit" are not synonymous. They are used in the alternative and not in the conjunctive. "Revenue" means income or receipts. "Profit" means that which remains of revenue after proper charges and expenses are deducted.

The word "revenue" is often found with the above meaning in our Constitution and statutes. It occurs twice in section 127 of the Constitution, which provides that when a city does not derive sufficient revenue from the operation of its utility to meet its expenses, and to provide funds to pay, on or before maturity, all bonds issued on account of said undertaking, the amount of such bonds outstanding, shall be included in deter-

mining the limitation of the city to incur a bonded indebtedness. As used in that section of the Constitution, the application of a similar definition is found in *McDaniel* v. *Clifton Forge, etc.*, 137 Va. 650, 120 S. E. 143, where this court held that the construction, erection and operation of an electric light system was an undertaking from which the city derived a revenue.

Whether the income of the city from the use of the utility is merely a revenue or a profit, is a matter for the city to determine, because it may raise or lower its rates to effect its purpose. An allowance for depreciation or otherwise, will of necessity have an effect on the amount of profit, but does not affect the amount of revenue. If revenue is the test, the matter becomes quite simple; but if profit is the test, we will have to consider the questions which enter into the making of a profit.

Since in the majority opinion, profit is made a test, or at least an essential part of the test, it is necessary to consider both the evidence and the law relative to the admission of the deductions from the gross income claimed in this case. The methods of determining profits are, perhaps, as varied as there are classifications of businesses and purposes to be accomplished.

It is agreed that the sinking fund of $160,000 or more per year should be stricken from the deductions, since it represents a profit taken out of the business to pay for the capital investment therein. It is a reimbursement for the amount put in the business, and if paid for out of revenue from the business, it remains as a profit to the owner after the indebtedness has been paid.

With reference to the fire protection service, I have no hesitancy in subscribing to the view that the furnishing of same is a public duty. While in a sense it is a profit or gain to the city, because if it did not furnish it itself, it would have to purchase it from others, it is not in a strict sense a revenue or income. It is not such a revenue or income as may itself be taken, used, or devoted to any other service. It is separate and distinct from a revenue derived from rental, or from private

sources, inside or outside the city, but comes within the phrase "or otherwise be a source of * * * profit."

So, this court said, in *City of Newport News* v. *Warwick County*, 159 Va. 571, at page 594, 166 S. E. 570, 578, 167 S. E. 583, *supra:* "The revenue or profit referred to is not limited to that derived from the outside use of the waterworks property or any other particular use, but can only mean revenue or profit derived from all sources pertaining to its use, including that derived from the use by the city itself for its own municipal purposes, as well as that derived from the use of the system outside the city's limits."

The city has been furnishing water for fire protection to the city of South Norfolk and to Norfolk county for which it has been making a substantial charge. No charge has been made to itself for a greater service, and it has set up its books to absorb the costs in the water division, through the increased rates charged consumers inside and outside the city. In the two *Newport News Cases* such a charge was made.

Good business usage would require that the city take this item into consideration in determining whether or not the water plant is being operated at a loss or profit. If the water were being furnished to a hydro-electric plant owned and operated by the city, it would be necessary to credit the water plant, and charge the hydro-electric plant with the amount consumed, in order to determine whether either was operated at a profit or loss. What is the difference if the service is furnished to the fire department, another branch of the government? Certainly neither the State nor the Federal rate or tax regulatory commissions will permit a corporation owning two utilities, or a utility and another business to offset the profits of one, or increase its cost of operation, in order to provide for the success of the other, and thereby increase its rates for service, or decrease the taxes upon the income. They will not permit a corporation to furnish its services or products to pay for fire insurance on the homes of its stockholders, and refuse to consider the value thereof as a portion of the gross revenue in determining whether a profit is earned; nor do hard-headed business men and engineers follow such a practice.

In this case the evidence places the lowest figure upon the value of such service at $148,000 per year. In the city's statement of operations, no charge is made for this service, although it is admitted that in order to be able to render it, the enlargement of the plant, the increase in the size of the pipes and the installation of fire hydrants, show a cost reflecting itself throughout the construction of the entire plant. These additional costs, however, are borne by the rates customers within the city pay for the water service and the increased rate which is charged to those outside of the city. The fire protection service is a benefit or profit accruing to the city for public purposes, as well as to the private interests of its citizens. If that portion of the property outside of the city which returns this gain is not subject to taxation, it is to that extent made a burden on the citizens of that outside territory.

To favor a policy allowing exemption when the return received is considered merely revenue, and not profit, and also to allow an exemption where the return is a benefit or profit, but not strictly revenue, seems to me to permit of a construction which is merely a juggling of words and a quibbling away of their meaning. In the application of a meaning to the words "revenue" or "profit", there should be some consistency.

The subject of depreciation presents a much more difficult question. The record here is silent on many particulars, which would be helpful in determining profits. We can all agree that some allowance should be made for wear and tear, waste and general obsolescence, unless it is otherwise taken care of. If, in addition to current repairs and maintenance, an allowance is made for replacement of original parts, and the plant kept in its original condition of usefulness, it is apparent no additional sum should be allowed for general depreciation.

In dealing with this subject in 1933, the court said in *Newport News* v. *Warwick County, supra*:

"As it seems to us, the only just and fair method of computation to determine whether the city of Newport News has derived a profit from the operation of its waterworks system is to deduct from its gross receipts: (1) All expenses of operation; (2) cost of maintenance of the plant, including all neces-

sary replacements of machinery, mains, hydrants, meters, etc.; (3) the cost of all new additions in the way of land, buildings, machinery and other equipment, etc., which are necessary for the efficient operation and service of the plan and not directly productive of additional revenue; (4) the cost of extensions of mains and pipe lines which do not add to the earnings; (5) annual interest charges on bonds issued for the purchase of the plant; and (6) taxes paid for the previous year, if any. There may be other deductions allowable under special circumstances in addition to those above mentioned.

"We do not think the city should be permitted to charge off any estimated amount on account of depreciation and at the same time be allowed the cost of maintenance and replacements. Any increase in the value of the property by replacing old property with new can better be taken into consideration in assessing the valuation of the same for taxation. It also appears manifest that reduction of the indebtedness against the property by payment of the principal of the bonds outstanding out of the earnings can only be regarded as profit."

In this case, the evidence shows that all current repairs, maintenance and replacement of original parts, had been included in the ordinary expense account and allowed. This includes replacements not productive of additional revenue, but does not include replacements of a capital nature, which are capable of producing more revenue, these items having been carried in the capital account. It is agreed that the record shows no basic valuation of the properties, or the separate parts thereof, and it is practically conceded by all witnesses that an accurate claim for general depreciation cannot be made without such a valuation. However, the city carries the whole of the properties at a book value of $11,000,000. Different from some properties, certain of the properties of a water company, such as dams and reservoirs, increase in value with age. The useful life of the reservoirs and dams is given as one hundred years; the pipe lines at sixty years; and the buildings at forty years. These constitute two-thirds of the entire property. The city has sought to treat the amount running from $160,000 to $170,000 per year, placed in the sinking fund, as

an item to provide for general depreciation. The city engineer and the city auditor, however, estimate $210,000 per year as a more nearly correct amount. Giving the life of this plant as thirty years, although it is testified that the properties will not need any major replacements until after thirty years, the city estimated and proceeded on the basis that the sinking fund annuity it set aside, with interest, would pay for the plant in that time. On the other hand, an eminent consulting engineer and two auditors, estimate that an allowance of $110,000 per year, would be sufficient with interest, to pay for the plant in thirty years. They further specifically state, however, that such an allowance, in addition to an allowance for current repairs, maintenance and replacement of original parts, would be a double allowance. It is shown that an allowance of $210,000 annually, placed either in a sinking fund, or in a fund to provide for general depreciation, would pay approximately $11,000,000 in twenty-eight years, the book value of the plant. Such a sum set aside over that period would completely discharge the present bonded indebtedness of approximately six and one-half million dollars, and leave the plant free of debt, in a condition as good as current repairs, maintenance and ordinary replacements could keep it, and provide a surplus fund of approximately four and one-half million dollars. If this does not constitute profit, I am at a loss to find a name for it. It is more than illusory profit, and, under any view, provides a quick method of purchasing the property without expenditure by the city.

In view of the evidence and of this court's ruling in 159 Va., *supra*, the trial court made no allowance for general depreciation, and in the absence of more specific evidence, could not have been expected to do so. On this point, the learned trial judge, an able and experienced jurist, in his written opinion, said:

"When we are told that for the years 1927 to 1933, inclusive, the outstanding bonds against the water plant have been reduced from $9,415,821 to $8,974,771 against which there has been created out of revenue a sinking fund of $2,258,754, which in effect reduces the bonded indebtedness

to $6,716,017; that the book value of the plant has increased from $11,545,781 to $11,900,634; that the city has supplied none of the funds for the development or operation of the water department; that from its own revenues it has paid its own way, and presented to the city free fire protection, etc., it must be conceded that those charged with the duty of managing this branch of the city's activities have shown unusual acumen coupled with a high order of financial ability."

However, if the view persists that an additional sum for general depreciation should be allowed, either the amount should be within reason and not more than $110,000 per annum, or this case remanded, with direction to the trial court to take further evidence and ascertain the correct amount. If only $110,000 is allowed, or the $165,000 set up by the city in its statement of operations, still a profit will be shown if a charge is made for fire protection service. If the sum is only $110,000 per year, a profit is shown without any charge for fire protection service. If we are generous and allow $148,000 additional, annually, as depreciation, and offset it by the fire protection service, still there will be profit.

I have no quarrel with the cases cited in the majority opinion dealing with an allowance for depreciation where the reasonableness of a rate for service, or a rate of dividend, is to be fixed by a public utility. In those cases, many factors are taken into consideration, which are not involved in a taxation case.

I will further agree that so far as current repairs, maintenance and replacements do not take care of general depreciation, an allowance should be made therefor. The allowance, however, should be reasonable and not be a double one, and should be based on more than mere speculation. Our Tax Code defines gross income and net income, and prescribes items deductible and non-deductible. In computing net income, it provides that no deduction shall be allowed for "any amount expended in restoring property or in making good the exhaustion thereof, for which an allowance is, or has been made." Tax Code, sections 24 to 27, inclusive.

If we are going to make profit the test of taxability, it is, to

say the least, a peculiar form of reasoning that will consider general depreciation as a factor, and not consider the benefit of a fire protection service as material.

This case was tried in the lower court as being controlled by the decision of the second *Newport News Case, supra.* The county insisted upon the correctness of that decision and its applicability here. The city contended that the decision there was erroneous, and asked that it be reviewed and over-ruled, and further insisted that the judgment of the circuit court be reversed upon the ground that its waterworks utility was not a source of revenue or profit to the city. The trial judge expressed disagreement with that decision in its entirety. The language used by him indicates that his disagreement was because the ruling suggested that the test of taxability depended upon whether or not a substantial profit was derived by the city from the operation of its water system as a whole.

It is suggested here that if we hold the city liable to taxation, the adjoining counties may also undertake to assess the property located in their respective counties. What concern has this court with that suggestion? Is it not a matter of policy and not one of interpretation of the Constitution? May it not as well be said that to reverse the second *Newport News Case, supra,* will invite those municipalities, which have heretofore paid taxes on their property, under the same state of facts as herein outlined, to ask for a refund of such taxes?

Comment is made on the failure of the county to make an assessment of the property for ten years. Prior to the amendment of the Constitution of 1928, the hopelessness of undertaking to tax this property was manifest in the prior decisions of this court. However, an assessment was made for the year 1928, as soon as the Constitution was amended, as shown by the case of the *Board of Supervisors of Nansemond County v. Norfolk, supra.* The present proceeding was begun in 1932, although it did not reach this court until 1936. Be that as it may, without regard to the confusion and contradictions surrounding the interpretation of the law involved, the failure, if any there be, of public servants to perform their duty, should not be permitted to affect the legal rights of the public they serve.

It may be interesting to note the practical effect of holding the property subject to taxation subsequent to the year 1929. The tax rate in Nansemond county on real property for 1931 was $1.50 per $100 of assessed valuation. The waterworks property therein located cost over four million dollars. It was assessed at a fair market value of $914,772. In round numbers, the gross receipts of the city from its waterworks system amounted to $872,000. The total revenue received from sources wholly outside of the city, not including the $12,000 from the Virginia Beach pipe line, amounting to $79,000, creating a proportion around 9%. Thus 9% of the assessed value would place the assessment approximately at $82,000, upon which the annual tax would be $1,230. While this is not a large sum, it is not *de minimis* so far as taxes are concerned. It is based upon a business or service, which was not done or rendered in the nature of a public duty which the city owed to the surrounding cities and counties.

If the legislative provision made the amount of the tax *de minimis*, it must be assumed that it did so for the purpose of making the constitutional act effective rather than ineffective. It may also be reasonably assumed that the cities of the State were interested in the provision in the legislation reducing the taxable amount.

If fire protection service is charged at $148,000, and added to gross receipts, the percentage of the assessment will be reduced from 9% to 7%, and the tax to less than one thousand dollars per annum. It will be even less for the years 1930 and 1931. Since the major portion of the property outside of the city is located in Nansemond county, the total tax assessable elsewhere, if any, at the same rate, would not be as great as that in Nansemond. No proportionate rate, however, can be allowed for 1929, prior to the enactment of Tax Code, section 435a.

The above figures are in round numbers, the same as found by the trial judge. It must also be remembered that the trial judge had the benefit of seeing and hearing the witnesses testify, and in accordance with the usual rule, weight should be given to his findings on matters of fact.

The books of the city show that the operation of the plant

was sufficiently profitable to meet the requirement of section 127 of the Constitution, and that its indebtedness on its outstanding water bonds has not limited the right of the city to incur a further bonded indebtedness.

Shall we permit the city to show a profit, in order to come within one provision of the Constitution, and then apply a different rule in order to permit it to come within the provisions of another section exempting it from taxation?

We are, perhaps, all agreed that the property of the United States is exempted because of Federal supremacy, that of the State because of its sovereignty, and at common law, that of political subdivisions because of the implied use for public purposes. Certainly, it has been generally held that such exemption of subdivisions of the State may be withheld in the discretion of the State. In New York and Vermont, statutory provisions requiring cities to pay taxes upon lands outside of their corporate limits, acquired for municipal purposes, have been upheld, as according to natural justice, between the outside taxpayers, who have no right nor interest therein, and those within the city, who receive the benefit therefor, regardless of whether such property is devoted to public or private use. *People ex rel. Amsterdam* v. *Hess* (1898), 157 N. Y. 42, 51 N. E. 410; *New York* v. *Mitchell* (1905), 183 N. Y. 245, 76 N. E. 18; *Village of Hardwick* v. *Wolcott*, 98 Vt. 343, 129 A. 159.

Other cases hold that where a municipal waterworks or light system is engaged in furnishing water or electricity to other cities, and to non-resident citizens, as well as to itself and to its inhabitants, such outside service is not a municipal use, and the property is subject to taxation. 4 Dillon, Municipal Corporations, 1396; *Stiles* v. *Newport*, 76 Vt. 154, 56 A. 662; *Village of Swanton* v. *Highgate*, 81 Vt. 152, 69 A. 667, 16 L. R. A. (N. S.) 867; *Knoxville* v. *Park City*, 130 Tenn. 626, 627, 172 S. W. 286, L. R. A. 1915D, 1103. In the latter case, the court so construed a constitutional provision where the exemption of municipally owned property was qualified by the clause, "and used exclusively for public or corporate purposes," a wording somewhat similar to our Constitution before the amendment.

From the facts in the record before us, and for the reasons of law assigned, it seems to me that the waterworks system here is so operated that it is both a source of revenue and profit to the city within the full intent and meaning of the Constitution. Certainly the outside use is not a municipal use. The extension of the service to Virginia Beach and to two other municipalities, is more than an incidental use and the revenue derived from such service is more than merely *de minimis*.

Chief Justice Prentis, in 153 Va., *supra*, considering a like question of taxability for 1928, made a rather pointed and significant reference to the change made thereafter by the constitutional amendment, and by Tax Code, section 435a, and indicated the conclusions subsequently reached by this court in 159 Va., *supra*, in 1933. The latter case is the only decision by this court based upon the amended Constitution. Whether it represents an effort of the court to reconcile conflicting views or not, with the exception of an unfortunate reference to revenue as meaning "net revenue", that case gave effect to the language and intention of the Constitution and statute. It has since been the guide of the trial courts and of the legal profession, and to reverse it now is to create a "confusion worse confounded."

It is only by ignoring plain and simple language, and giving scant consideration to the evidence before us, that we can reverse the trial court, reverse the decision in 159 Va., *supra*, and, in effect, negative the express will of the law-making bodies.

Hudgins, J., dissenting.

The case turns upon the proper construction of section 183 of the Constitution. It is not clear just what change, if any, the Prentis commission intended to make in the taxation of lands and buildings not owned by the State, and otherwise exempt from taxation, when such lands and buildings are leased or otherwise "a source of revenue or profit" to the owner.

That question was before this court in the case of *Newport News* v. *Warwick County*, 159 Va. 571, 166 S. E. 570, 578,

167 S. E. 583. In that case, Justice Chinn reviewed the decisions of the court prior to 1928, the history of the constitutional provision and with one Justice dissenting and another concurring in results, the following interpretation was announced as the deliberate opinion of the court: "The revenue or profit referred to is not limited to that derived from the outside use of the water works property, or any other particular use, but can only mean revenue or profit derived from all sources pertaining to its use, including that derived from the use by the city itself for its own municipal purposes, as well as that derived from the use of the system outside the city's limits. In other words, in order to determine whether any building or land in the instant case is taxable under this provision, it must be ascertained whether there has been a revenue (meaning net revenue) or profit derived from the total revenues of the entire water works property, of which said buildings or land is a part."

Paragraph number five, page 595, of that opinion sets forth the method of computation to determine whether or not such lands or buildings are a source of profit to the owner.

We are not bound at all times and under all circumstances to apply the doctrine of *stare decisis*, but it is important that interpretations of statutes and constitutional provisions be consistent. The question we are dealing with in this case is a practical and important matter to all subdivisions of the State. The construction of section 183 of the Constitution as set forth in the *Newport News* v. *Warwick County Case* was made after a very careful and deliberate study. The principles there announced have been a guide to the taxing authorities of the political subdivisions of the State and in my opinion should not be overruled or complicated by further refinement.

· Applying the principles to the evidence in this case, it seems clear to my mind at least that the operation of the water works system of the city of Norfolk, for the years enumerated, has been a source of profit. This being true, the property in question is subject to the tax as provided by section 435a of the Tax Code. I think, therefore, that the judgment of the trial court should be affirmed.